The mother, Ella Glover, appeals from an order of the Family Court of Jefferson County finding her two minor children to be dependent, terminating her parental rights to the children and placing their permanent custody with the State Department of Pensions and Security (DPS) for adoptive planning.
The first issue presented for review is whether the evidence supports the trial court's findings of dependency and termination of parental rights.
DPS petitioned for permanent custody and termination of parental rights of the mother in April 1979. The children have been in the custody of DPS by commitment order since 1978. A psychological evaluation of Miss Glover was conducted with subsequent testing and interview. An expert diagnosed Miss Glover as a paranoid schizophrenic with mild mental retardation. Her history of mental illness supports this diagnosis. The expert, a psychiatrist and vice chairman of the Department of Psychiatry at University Hospital, UAB, testified that this condition would make it difficult for Miss Glover to establish satisfactory relationships on a family, social and work basis. Her illness was diagnosed as chronic and interfering with her ability as a parent.
While admitting error in conduct, Miss Glover contends that the incidents made the basis of three petitions of dependency were not significant insofar as harm to the children. Except for one incident when the children were found to be dirty after they were left for some time in the home of a blind friend, the evidence supports her contention. It is possible that harm may have come had not authority entered the picture. Such possibility is speculative however.
The evidence was that the home, however humble and changing, was always acceptably clean. There were times that the rent and utilities were delinquent. On one occasion the gas was cut off during summer months because of an unpaid bill. It must be to the credit of the mother that the children were never found to be abused, unclothed, unfed nor in ill health while in her custody. If such conditions existed, it is reasonable that the DPS caseworkers who were in regular contact with the family unit since 1977 would have discovered them.
Since the children were placed in the custody of DPS in 1978, the girl, now past the age of seven, has been determined to be mentally retarded. She has developed psychological problems evidenced by spreading her feces about her face and sexual fixation upon herself and others. There has been some indication of possible sexual abuse. She is developing violent and destructive tendencies. The children are in a foster home with at least one other older dependent child and older children of the foster family.
There was testimony that because of their ages, retardation, psychological profiles and scarcity of black adoptive families, the prospect of adoption is slight to none. It is not known whether separation from her mother has contributed to the girl's mental and emotional problems. If she continues without improvement, she may be transferred to an institution and thus separated from her brother. Separation would be detrimental to him as he is attached to his sister.
These children have now been separated from their mother since early 1978. The boy has been in foster care since infancy and hardly knows his mother. The girl has *Page 788 
an emotional attachment to her mother. The mother has visited with the children at the DPS office from time to time.
Most of the testimony produced by DPS during three lengthy hearings before two judges has related to the mental, emotional, psychological and character weaknesses of the mother. It is undisputed that she has a low I.Q. but is functional. She has little income and has been less than successful in meeting some of the goals set by her case-workers over the years. These goals were deemed necessary to be accomplished by the mother before the return of her children to her. She has been strong on promises and weak on performance. However, she has been consistent in expressing her love for her children and continuing efforts within her means to secure their return to her. At the last hearing she produced evidence and exhibits to show that she had secured reasonable accommodations for sheltering the children. She further showed that she was active in church affairs and had a responsible relative now willing to aid and assist her if the children were returned.
We consider important that the State, in seeking permanent termination of parental rights, as compared to temporary custody of a dependent child, establish not only the permanent incompetency and unsuitability of the parent by clear and convincing evidence, but that it present a viable alternative to better serve the future welfare of the children.
From our careful consideration of the record, there appears a picture of a black unmarried woman of limited intelligence, the mother of two children by different men, financially dependent upon public assistance except for contribution of a live-in male friend and apparent father of the last child. One, perhaps in medical terms, a paranoid schizophrenic, but not violent or dangerous. She has on occasion drunk alcohol to excess and left her children for a time in the perhaps unqualified care of another. She has kept a clean house and apparently sufficiently clothed and fed her children. She has improved somewhat in attitude and performance since deprived of custody of her children, but adamantly insists the children are hers and she should not have to conform to the strict demands made of her by the state in order to secure the return of her children. She insists she loves and wants her children.
What picture does the State present as to the future of these children if they are permanently removed from their mother?
Two black children, ages seven and three. Sister and brother. A girl with serious psychological abnormalities, possibly contributed to by removal from her mother, and mentally retarded. The psychological disorders have arisen since removal from the mother into foster homes and appear to be getting worse to include violence and destructiveness. She is clearly emotionally attached to her mother. She may have to be institutionalized. Her chance of adoption is extremely slight. A boy, possibly retarded, probably has no recollection of his mother. Loves his sister. Separation from her would be detrimental to both of them. Chance of adoption — unlikely. Foster home care for both is changeable and difficult to secure.
Thus it can be said that the future presented after termination and permanent removal of maternal and family ties has little if any more prospects of serving the best interests of the children than if they were returned to the mother. At least, there appears so little advantage on the side of termination for it to fall far short of "clear and convincing." It can be contended, and is by counsel for the mother and the guardian ad litem, that the best interest of the children would be best served by returning the children to the mother — at least on a supervised trial basis. We tend to agree with that contention; however, we consider that the trial court should make that decision after further consideration, with the aid and assistance of DPS and other appropriate available sources. We decide here only that the evidence at this time does not rise to the status of being so clear and convincing that the children are so dependent as to require the last and most extreme order of disposition permitted by *Page 789 
statute. § 12-15-71 (a)(6). We further determine that such disposition is insufficiently shown to serve the best interest of the children.
We hasten to observe that our decision does not reflect either upon the personnel of DPS who have performed conscientiously in this case in spite of an overload of cases. Neither does it reflect upon the able judges who have conscientiously and patiently listened to hours of testimony and read many pages of documents and reports. This court fully recognizes the difficulty of such cases. We realize that this is a relatively new Juvenile Code with little case precedent.
Though this court previously has not endorsed all the things said in the case of Roe v. Conn, 417 F. Supp. 769 (M.D.Ala. 1976), we continue in that posture. We do adhere to the principle that termination of parental rights by the State should occur only upon strong proof of abuse and/or continuing neglect of the welfare of the child. We have said that the right of a parent to a child is a fundamental and prima facie one and may be overcome only by substantial evidence of the best interest and welfare of the child after looking to viable alternatives. Miller v. Alabama Dept. of Pensions and Security,374 So.2d 1370 (Ala.Civ.App. 1979); Lovell v. Department ofPensions Security, 356 So.2d 188 (Ala.Civ.App. 1978). We consider this principle is espoused by the words of the disposition statute. § 12-15-71, Code of Alabama (1975).
In view of our decision to reverse the order of termination, we fail to perceive necessity or benefit in discussing additional argued issues. It is sufficient that we find none to be of prejudicial stature. We have addressed the only constitutional issue properly raised below — previously inMiller, supra.
REVERSED AND REMANDED.
BRADLEY and HOLMES, JJ., concur.