929 P.2d 940 (1996)
Rosemary Emilie BUSH and Alan Dean Bush, Appellants,
v.
The STATE of Nevada, DEPARTMENT OF HUMAN RESOURCES, Respondent.
No. 26543.
Supreme Court of Nevada.
December 20, 1996.
*941 Paul M. Gaudet, Las Vegas, for Appellants.
Frankie Sue Del Papa, Attorney General, and Linda C. Anderson, Deputy Attorney General, Carson City, for Respondent.

OPINION
SHEARING, Justice:
This is an appeal from the district court's order terminating the parental rights of natural parents, appellants Rosemary Emilie Bush ("Rosemary") and her husband Alan Dean Bush ("Alan"), as to their children Alan Everett Bush ("Alan Everett") and Frisco Lou Bush ("Frisco"). Rosemary and Alan are mentally challenged. Rosemary has an IQ of 65, Alan an IQ of 71. Their children are also mentally challenged and participate in specialized school programs.
In December, 1988, Clark County Juvenile Court Services received a physical abuse complaint concerning the Bush family. A child protective services worker was assigned to the matter. She attempted to work with the Bushes to resolve the problems of Alan's physical abuse of one of the Bush children, marital discord between Rosemary and Alan, and a filthy home. At that time, Alan had moved out of the home temporarily, and Rosemary refused to accept referrals and other family assistance. After eight months of unsuccessful efforts, the worker recommended terminating Rosemary and Alan's parental rights.
On August 4, 1989, after the unsuccessful efforts to remedy the home situation, Alan Everett and Frisco were placed in Child Haven. The Clark County District Attorney filed a neglect petition alleging that Rosemary and Alan were neglectful in caring for their children because of marital problems, including arguing and fighting in front of the children. Additionally, it was alleged that Alan spent the family income irresponsibly without leaving enough for monthly obligations and the children had developmental delays. On August 18, 1989, Rosemary and Alan admitted to the neglect petition. The matter was then transferred to the Nevada State Division of Child and Family Services ("DCFS") for action. A case plan was filed on October 17, 1989, listing objectives to attain reunification of Alan Everett and Frisco with Rosemary and Alan and ordering them to comply with the plan. The matter came before the court for review twice each year from 1990 through 1993. By November 1993, termination efforts had been commenced. The petition to terminate the parental rights of Rosemary and Alan to Alan Everett and Frisco was filed on June 17, 1994. Rosemary and Alan were appointed counsel for this proceeding. After a hearing in October, 1994, the district court filed a decision granting the petition.
In its decision, the district court found two parental fault grounds to support termination of the Bushes' parental rights: parental unsuitability and failure of parental adjustment. The court found that even when the Bushes were willing, they failed to "assimilate and practice the lessons being taught" and would never be able to reach a level of ability sufficient to meet the physical and emotional needs of their children. The court also determined that (1) efforts of the agencies involved were reasonable and appropriate, (2) the testimony and exhibits reflected that parenting classes, independent living, financial aid and assistance and other appropriate services were extended to the family, (3) DCFS made monthly visitation efforts, and (4) the level of services extended to the family reflected the Bushes' failure to be receptive to the services. The district court also determined that (1) the children's best interests would not be served under any reasonable circumstances by sustaining the parental tie, (2) the children have been in foster care for three and one-half years, (3) the foster parents are willing to adopt the children, (4) the children have "bonded" to the foster parents, (5) further efforts to reunify the Bushes with their children "will not change the obvious," and (6) reunification is not foreseeable even if the court were to deny the petition to terminate parental rights. On October 25, 1995, the district court filed Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights. The issue on appeal is whether clear and convincing evidence supports the district court order. We conclude that it does.
*942 The first question is whether the evidence supports the findings of parental unfitness and/or failure of parental adjustment under NRS 128.105. For determining parental unfitness, NRS 128.106 provides the following guidance:
In determining neglect by or unfitness of a parent, the court shall consider, without limitation, the following conditions which may diminish suitability as a parent:
1. Emotional illness, mental illness or mental deficiency of the parent which renders the parent consistently unable to care for the immediate and continuing physical or psychological needs of the child for extended periods of time.
For determining whether there has been a failure of the parents to adjust, NRS 128.107 gives the following guidance:
If a child is not in the physical custody of the parent or parents, the court, in determining whether parental rights should be terminated, shall consider, without limitation:
1. The services provided or offered to the parent or parents to facilitate a reunion with the child.
2. The physical, mental or emotional condition and needs of the child and his desires regarding the termination, if the court determines he is of sufficient capacity to express his desires.
3. The effort the parent or parents have made to adjust their circumstances, conduct or conditions to make it in the child's best interest to return him to his home after a reasonable length of time, including but not limited to:
(a) The payment of a reasonable portion of substitute physical care and maintenance, if financially able;
(b) The maintenance of regular visitation or other contact with the child which was designed and carried out in a plan to reunite the child with the parent or parents; and
(c) The maintenance or regular contact and communication with the custodian of the child.
4. Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent or parents within a predictable period.
For purposes of this section, the court shall disregard incidental conduct, contributions, contacts and communications.
The evidence supporting both parental unfitness and parental failure to adjust is essentially the same in this case. The children have been out of the custody of the parents since August, 1989, after a six-month period when Child Protective Services tried to work with the parents to keep the children in the home. State and county social workers tried for almost six years to assist the parents to reach the point where they could appropriately take care of their children. They were unable to do so.
The evidence is undisputed that each parent has a mental deficiency. Whether the deficiency renders each consistently unable to care for the immediate and continuing needs of the children for extended periods of time is the disputed question. Clearly, the Bushes love their children and have made some efforts toward becoming better parents. For example, they have sought more appropriate housing, have attended some parenting classes and managed their money more responsibly. However, they refused to complete either counseling or parenting classes. Randall Stiles, a child development specialist from the Children's Resources Bureau of the DCFS testified that after interviewing their social worker and the Bushes, and after observing the Bushes during a monthly hour-long visit with their children, he concluded that the Bushes had little to no desire to complete the case plan and were not cognizant of their own weaknesses as parents.
Rosemary admitted at the hearing, and the history of the case demonstrates, that they continue to resist the assistance of various agencies both to improve their abilities and to help the children to overcome their deficiencies. The children both have very special needs which would daunt an above-average parent without outside assistance. The admission of the persistent refusal of the parents to recognize the need for *943 assistance, and the testimony of the social workers of the six years of effort, provide clear and convincing evidence that the Bushes are unable to meet the immediate and continuing needs of the children, both because of their unfitness as parents to these children, and their failure to adjust as parents. There is no reason to believe that they will not continue to be substantially incapable of parenting.
We note that other courts which have reached this issue have terminated parental rights when mental deficiency prevents the parent from being a "fit" parent. For example, in In re Interest of D.L.S., 230 Neb. 435, 432 N.W.2d 31, 35 (1988), the court affirmed the termination of parental rights where the mother "suffered from a mental deficiency... which would prevent her from ever acquiring adequate parenting skills." The court concluded that the mother "remained substantially incapable of applying what she was taught." Id. 432 N.W.2d at 37.
Courts have also terminated parental rights where a mental deficiency results in "failure of parental adjustment" despite the provision of adequate resources to the parent. In M.F.K. v. State Dept. of Human Resources, 571 So.2d 317, 318 (Ala.Civ.App. 1990), tests showed that the mothers were "limited in their mental abilities." The court affirmed termination, concluding that where a state agency worked with the parents for an "extended period of time," possibly from 1977 until 1989, "appropriate adjustments allowing for the return of the children" were not made. Id. at 319. Likewise, in Ex parte State Dept. of Human Resources, 624 So.2d 589 (Ala.1993), a petition requesting parental rights termination alleged that the parents had an emotional or mental illness which made them unable to care for the needs of their child. The trial court found clear and convincing evidence that it was in the child's best interest to terminate parental rights. The court made this finding despite the fact that the parents regularly visited the child during scheduled times while the child was in foster care, the mother attended a parenting class, and the father remained employed, because there was no evidence that the parents tried to improve the condition of their home or their circumstances, and the parents had made no reasonable efforts to prevent the need to remove the child from their care. Id. at 591. The appeals court reversed on the basis that the parents had not been afforded an opportunity to parent the child because she or he had been taken from them immediately after her birth. The Alabama Supreme Court reversed, concluding that the parents failed to make any changes in their living conditions even after a state agency requested that they accomplish rehabilitation.
In other cases, courts have reversed orders terminating parental rights where the state failed to show that termination was in the child's best interests,[1] or failed to provide appropriate services for the mentally challenged parents.[2] Some courts have required the district court to make a finding of current *944 unfitness. None of these problems is present in the instant case.
We also conclude that there was clear and convincing evidence that the best interests of the children would be served by termination of the parental rights. Frisco and Alan Everett have special needs and require a level of care that is arguably difficult even for a person of ordinary intelligence to provide. In addition, both boys have spent at least four years in their present foster home. When the boys were placed in foster care, Frisco was ten months old and Alan Everett was two years old. The court-appointed special advocate ("CASA") observed the boys in their foster home for two years and believes that the foster parents relate well to the boys. The foster mother testified that if the children were free for adoption, she and her husband would adopt them. The child development specialist at the DCFS recommended that Frisco and Alan Everett remain in foster care so that their physical, developmental, and emotional needs continue to be met. We conclude that Frisco's and Alan Everett's best interests are not served by sustaining the tie to Rosemary and Alan.
The district court noted its dismay that Frisco and Alan Everett have remained in foster care for five years. We agree with the court's expressed dissatisfaction. While the parents' right to retain their children is an important consideration in the analysis, the rights of the children to a stable future with a loving family must be paramount. Otherwise, the children's development is compromised for the sake of the parents. Thus, we affirm the order of the district court.
YOUNG and ROSE, JJ., concur.
SPRINGER, J., dissents.
STEFFEN, Chief Justice, concurring:
I concur in the result reached by the majority, but consider it necessary to comment on our dissenting colleague's opinion.
I would first note, prefatorily, that I view Justice Springer's dissent with more than a small degree of approbation because he again addresses this most difficult and excruciating subject of termination of parental rights with a concern and sensitivity that reflects a commendable ongoing regard for this most vital and precious interest of parents in the right to enjoy life with their children. Although I find it necessary to disagree with my colleague's positional outcome regarding the instant case, I consider it important to again be reminded that we are not merely disposing of another case on appeal. We are asked to carefully and respectfully act as a final safeguard against an erroneous determination in the lower court that permanently severs the tie between parent and child  a fate that most of us who are blessed with children would consider far worse than our own death.
I am unaware of the number of termination cases that are finalized in the district courts without appeal. It seems safe to assume, however, that virtually every such case we see on appeal evinces at least some degree of parental love and interest concerning a child or children who are on the brink of extinction as far as their appealing parents are concerned. As a practical matter, we are the parents' last source of hope for keeping the family alive. I thus agree with Justice Springer that this court must review these tragic cases with the greatest degree of diligence and concern  a premise recognized with an element of trepidation given the enormous caseload burdening this court.
Our dissenting colleague, it seems to me, speaks too categorically when he suggests that "the poor, sick and powerless are almost routinely being taken from their natural parents and permanently given to more talented parents." Justice Springer cites no authority for this assertion and I genuinely hope that he could not do so. Impoverished parents can be just as unfit as wealthy parents, but I must admit that poor parents may often suffer terminations where those who can afford timely counsel and supply more favorable home conditions will not. I would therefore agree that the impoverished, downtrodden and generally more vulnerable parents should receive at least the same level of social welfare concern and judicial scrutiny and solicitude as parents who enjoy the financial means to marshal a vigorous and timely defense of their rights as parents. In *945 other words, "equal justice under law" must have special meaning in these types of cases, notwithstanding the realization that some parents are inherently disadvantaged by various handicaps not of their own making, but which nevertheless can tragically impact the lives of their children.
Unfortunately, these cases often present the courts with the Hobson's choice of either preserving parental rights at the expense of the children or sacrificing the parents in order to salvage the lives and futures of the children. Where it has been patiently and responsibly determined that both interests cannot be preserved without extensive injury to the one or the other, our Legislature has determined, and so must we, that the lives and the best interests of the children must take precedence. However, that is not to say in the least that if the poor, the sick and the powerless can be replaced as parents by those who would be "better" or more "talented," our law would support the state in doing so. The very thought defies decency and reason, and in any event would be a stark violation of the Constitution.
Turning now to the instant case, it is true that we are faced with loving parents who are mentally disadvantaged. As our colleague has so effectively noted, this alone must give us serious cause for concern, for this nation has a laudable public policy favoring affirmative measures to assist our handicapped citizens in the pursuit of meaningful, quality lives. See McKay v. Bergstedt, 106 Nev. 808, 825-28, 801 P.2d 617, 628-30 (1990). However, when it comes to an evaluation of parental fitness or neglect, as the majority opinion notes, the courts are under statutory mandate, NRS 128.106, to consider emotional and mental illness or mental deficiency of the parents where it adversely impacts the physical or psychological needs of the children over extended periods of time.
Unfortunately, mental handicaps may produce conditions that are inconsistent with functional, healthy home environments for children. Although fault is absent, the impact on the children is just as great as if fault were present. But I note at the outset of my evaluation of the facts that this is a most unfortunate case  indeed, unfortunate to the extreme. Even at this late, late date, this is a very close and difficult case.
Tragically, in affirming the district court's decision to forever deprive these parents of their children and leave them with no more rights concerning the children than strangers off the street, I am convinced that we are sacrificing basically good and well-intentioned parents to a cumbersome, overloaded system that has managed to keep the children from their parents for over seven years. The one child, Alan Everett Bush, was removed from the parental home at approximately one and one-half years of age, and the second child, Frisco Lou Bush, taken from the home at the same time, was a ten-month-old infant. The children have been living in a foster home since 1990, and the foster parents with whom they have bonded want to adopt them. This is essentially the only home and family these children know.
In reading this record from cover to cover, I am left with an abiding belief that these "mentally deficient" parents are not sufficiently "deficient" to render them incapable of being fit and caring parents. Moreover, in reading the testimony of the State's witnesses, I shudder at the amount of conjecture and speculative "forecasting" I saw there. Aside from a fearsome amount of "educated guesses" drawn from factual patterns that are far from established or egregious (or, for that matter, perhaps not all that far from normal), jurisdictional grounds were found to exist in the form of parental unsuitability and failure of parental adjustment. If we were reviewing this appeal seasonably, I would reject these findings.
The record reveals that for a period of time there were instances of argument between the parents in front of the children. There is meager evidence of a somewhat violent episode. Mr. Bush also made the mistake of impetuously purchasing a television set and stereo that the family could not afford (like how many other millions of parents across the country). There was also equivocal and conflicting evidence that at least on occasion, Mr. and Mrs. Bush failed to keep a clean apartment. The Bushes were also disparaged by a child development expert for their low income, their housing *946 and their lack of transportation. Indeed, this expert found the Bushes lacking in nurturence and bonding with the children, a rather remarkable observation given the fact these parents had been restricted to such scant and unnatural visitation (one hour per month at the agency over an extended period of time) with their children. The Bushes were also found wanting in being "resistive" to some of the services offered by various agencies, and for not completing all of their programmed activities.
Despite the list of less than compelling negatives, including the fact that the children required special education and medication, these parents would ride their bicycles several miles to visit their children and made substantial attempts to abide by agency programs and directions which they believed were designed to effectuate a reunification with their children. The record frankly causes me to wonder about the extent to which these parents were ever intended to realize a reunion with Alan and Frisco. As counsel for the Bushes noted, it appears that his clients were doomed primarily because of their mental deficiencies, and my reading of their testimony leaves me with gnawing doubts about the accuracy of the evaluations on this critical point.
Notwithstanding the foregoing, I concur in the result reached by the majority because it appears to me that under the tragic facts of this case, we must resolve doubts as to whether jurisdictional grounds were demonstrated by clear and convincing evidence in favor of the children. I reach this conclusion advisedly, however, knowing that such a resolution may be viewed as an infringement of the Bushes' constitutional rights. It is clear, however, that the Legislature has made the best interests of the children paramount in these types of proceedings, and I am convinced that at this late date, it would be extremely traumatic for the two boys to either be again placed in limbo or be torn from the arms and love of the only parents that they now truly know.
In studying this record, I was painfully reminded once again that we must find some means of expediting these matters so that tragedies such as the one before us may be avoided. However, I emphasize this without criticism of the lower court or the various agency workers involved over the agonizing history of this case. Resources are scarce, and social services personnel are limited in what they can do given the extent of their caseloads. Nevertheless, we are discussing the devolution and destruction of families, and we can no more afford to impose a "death sentence" on undeserving parents than we can afford to impose capital punishment on an innocent criminal defendant.
For the reasons noted above, I concur with the result reached by the majority, but with great respect for the concerns expressed in the dissent.
SPRINGER, Justice, dissenting:
The State permanently deprived a mentally handicapped mother and father of "the right of love and association" with their two children, because of the "genetic or physical limitations" suffered by these parents. (Trial Court's Decision, October 19, 1994). The Bushes have lost their children because the courts have concluded that they are "incapable of obtaining the skills" in parenting that parents must now possess in order to avoid the threat of having the State take away their children and give them to new, more skillful parents.
This case is one of a number of termination cases in a spate of cases in which poor and handicapped parents have lost their children to substitute parents because of a supposed lack of parenting skills and because the "best interests" of their children is supposedly being served by presenting them with a new and better set of parents.
I am not sure what causes can be attributed to these onslaughts on the poor and the handicapped, but it seems to me that they can be traced to the 1987 amendment of NRS 128.105, in which a provision was added to the termination statute, stating that the "primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination." As I see the various cases now coming before this court in which children of the poor, sick and powerless are *947 almost routinely being taken from their natural parents and permanently given to more talented parents, I get the feeling that agents of the State have misinterpreted the statutory "best interests" addition to authorize a much greater intrusion into Nevada families.
Those who believe that the "best interests" amendment gives greater powers to the State in permanently depriving natural parents of their parental rights and bestowing those rights on more "skillful" parents are, of course, wrong. The "primary consideration" in termination cases is and always has been the "best interests of the child." It just cannot be the only consideration.
Even before Champagne v. Welfare Division, 100 Nev. 640, 691 P.2d 849 (1984), this court recognized the "`dominant purpose of serving the best interests of the child.'" Chapman v. Chapman, 96 Nev. 290, 292, 607 P.2d 1141, 1143 (1980) (quoting NRS 128.090). It is certainly appropriate for the courts to consider the interest of the child as a "primary consideration," so long as, in doing so, they do not ignore the constitutional rights of the parents, as this court appears to have done in the present case. As we noted in Champagne:
We agree that children's interests should be paramount; but their interests cannot displace established liberty interests of natural parents. Children cannot be taken from poor parents and placed permanently in the home of substitute parents simply because their "emotional needs" would be better served or because they might have a cleaner, neater, or richer environment.
100 Nev. at 649 n. 6, 691 P.2d at 856.
Whether the increase in the number of cases involving the termination of parental rights of the poor and handicapped is caused by a misreading of the "best interests" amendment of NRS 128.105 or by some other reasons, a certain pattern of cases is quite obviously on the increase. Here is the pattern:
Poor or handicapped parents are having trouble raising their children. The kinds of problems that these parents have are too legion to catalogue, but the common result is that the State removes the children from the home "temporarily." Almost always this is done by court order on a petition unopposed by the poor family, primarily because they do not have counsel.
Welfare imposes upon the parents a "reunification" plan that is supposed to be designed to get the children back into their home. In many cases the problems of poverty, mental or physical incapacity and other difficulties that brought about the family separation stand in the way of the parents' satisfactory compliance with the "reunification" plan.
The children are placed in the home of substitute parents, parents who are usually in a much better position to provide a "nicer" and more "nurturing" home environment. The natural parents visitation becomes more and more difficult and awkward. The children (naturally) "bond" and "integrate" with their substitute parents.
Welfare gives notice to the natural parents that they have flunked the reunification test, that their children are better off in their new home and that the natural parents must say "goodbye" forever to their children.
The parents get notice of the termination hearing. They finally, too late, get an attorney appointed to defend against the State. They lose their case. The children have a new set of parents. The natural parents have nothing.
Having described the pattern that I am perceiving in the cases now coming before the court, I want, before proceeding, to say that I do not intend this dissent to be an indictment of welfare workers. What they are doing, they believe, I am sure, to be the proper, legal and moral thing to do. If I were to attribute any fault to what is happening, I would attribute that fault to this court, which refuses to give needed guidance to welfare officials by refusing to declare the statutory and constitutional limits upon the kinds of activities that I have described.
I want to say further that I fully realize that there are many cases in which children live in the homes of abusive and unfit parents and that, once removed, they probably should *948 never go back. I also want to make it clear that I fully understand the "damned-if-you-do-damned-if-you-don't" dilemma that Welfare officials are placed in. One voice is telling them to try to "reunify" the family and place the children back in the home. Another voice is warning them that the children will be permanently injured, physically or developmentally, if they are permitted to be raised by abusive or neglectful natural parents. In most cases, Welfare case workers make the best of very difficult situations; and, having some familiarity with their trying work, I want to say that they have my highest respect and admiration.
In the case now before the court, however, it appears to me that the Welfare Division initiated and carried out termination of parental rights proceedings solely because the parents were mentally handicapped. This is wrong. It also appears to me that the termination of parental rights in this case was probably principally motivated by the reality that the substitute home was a better home than the home that could be provided to the children by their handicapped parents. For reasons that I will explain in this dissent, I am very much concerned about prevalent social engineering theories that promote the permanent termination of parental rights of faltering and "inadequate" natural parents based on the assumption that placement of children in a "better" home will necessarily serve the children's "best interests." I am opposed to any social or legal theory that promotes the severance of parental ties just because the children (naturally and understandably) appear to have "become integrated" in a new, perhaps more amiable, home situation.
At the time of the termination decree which ended the Bush's parental relationship with their children, the children were six and seven years old. The reasons given by the trial court for severing the parental ties were that the Bushes were "unfit parents" and that they had "failed to adjust to become proper parents within a reasonable period of time." At the time the termination proceedings began, the Bushes had been involuntarily separated from their children for a period of almost five years.
According to the trial court, Mr. and Mrs. Bush suffer from "reduced mental capabilities" (IQ's of 65 and 71) and are "incapable of obtaining the skills necessary for [the] reunification" that would allow the Bushes to raise their children. (Emphasis added.) The trial court concluded that although there may have been a "technical compliance" with the Welfare Division's "Case Plan," "the lessons are not being learned and practiced by Mr. and Mrs. Bush." (Emphasis added.)
After the State took the Bushes' children out of their home, the Bushes continued to try for a long time to do what was expected of them to get their children back. According to the trial court, they did "make significant efforts to gain the education and skills necessary to raise their children." The trial court observed that failures on the part of the Bushes to meet standards imposed upon them by the Welfare Division "may very well have arisen from the Bush's inability to succeed" and then concluded that the Bushes could "never be able to reach a level sufficient to meet the physical and emotional needs of their children." (Emphasis in original.)
The trial court concluded that "[e]ven when [the parents] have been willing, they have failed to assimilate and practice the lessons being taught" and that it is "more likely" that the Bushes are "incapable of correcting the conditions that led to the removal of the children."[1]
Put plainly, this is not a case of parental fault, it is a case of faultless parental mental incapacity. The trial court concluded that no matter how hard they tried, the Bushes did not have sufficient intelligence to be entrusted with raising their children. The trial court concluded in its "Statement of Law" that the "result is the same regardless of whether the issue is the parent's inability or unwillingness," which is to say that it does *949 not matter whether the Bushes were handicapped or recalcitrant. I think the question of fault or incapacity matters a great deal, and I am of the view that this court's refusal to deal with the question of fault versus incapacity in termination cases is an inexcusable dereliction on its part.
The leading case in Nevada in this area of the law, the Champagne case, gives no appreciable guidance as to when it is justified for the family court to terminate the parental rights of parents who are, faultlessly, physically or mentally handicapped. 100 Nev. 640, 691 P.2d 849 (1984). I do not blame the district judge for arriving at a legally incorrect decision in this case, as he had no real precedential guidance on this vital subject. As I have said, my reading of the record tells me that the district judge did a very thorough and thoughtful job in dealing with this difficult and troubling case. I wish I could say the same for this court, which has decided the case superficially and has not even touched on the momentous issues presented by this controversy.
Let me now look a little more deeply into how it came about that the State permanently denied two loving but mentally handicapped parents of (as it was put by the trial judge) "the right of love and association with their children, especially when the inability to care for the children may arise from genetic or physical limitations."
There can be no question that the Bushes were far from being model parents and that they were having difficulties raising their children. Not surprisingly, the children of these two mentally deficient parents were, themselves, "developmentally delayed." When the Welfare Division filed its child-neglect petition it did not mention the single most significant aspect of this case, the parents' handicap. The petition stated, as grounds for the petition, only "marital discord," "family income irresponsibility" and the children's "developmental delays."
The Bushes do have very limited reading and writing skills, and it is extremely unlikely that they understood the nature of the proceeding or the dire consequences that eventually followed the filing of the petition. When the petition that resulted in their having their children removed from their home was first brought to court, they did not have an attorney, and they did not, consequently, file any legal opposition to the petition. These undefended proceedings not only resulted in the removal of their children from their home, but the court action taken in these proceedings was the primary cause of the eventual, permanent termination of their parental rights.[2] The children were removed from the home on August 4, 1989, when one was two years old, and the other was 10 months old. That was the end of the Bush family.
At some point during the Bushes' attempt to get their children back, an "independent living specialist" from the Nevada Association for the Handicapped became involved and put the Bushes into a program the sensible purpose of which was (as stated in the trial court's Decision) "to provide `incremental goals' to avoid overwhelming the parents."
In September of 1992, after the children had been separated from their parents for over three years, a Welfare Division worker reported to the court that (according to the trial court's Decision in this matter) "the parents were making every attempt possible and that the children would be a handful even to high functioning parents." The worker recommended "long-term foster care but not termination of parental rights." (Emphasis in original court Decision.)
In November of 1993, the Welfare Division's position changed. For reasons that do *950 not appear in the record, the Nevada Association for the Handicapped had discontinued its program, and the Bushes' attempt to regain their children lost some of its thrust. An inimical CASA volunteer "continued to assert that the Bush's were not capable of giving the children a permanent home." (Emphasis added.) At this time the Welfare Division recommended the institution of termination of parental rights proceedings. Termination proceedings were filed by the Welfare Division on June 17, 1994. With regard to these proceedings, I must agree with the Bushes' attorney, who wrote in his Pretrial Memorandum that "[t]his case evolves solely from the mental deficiencies of Rosemary and Allen Bush."
None of the consolidated cases dealt with in Champagne involved permanently depriving faultless, handicapped persons of their children; but Champagne does make reference to the possibility that permanent parental severance might be justified in no-fault cases of "incapacity" and cases in which there is an "irremediable inability to function" as a parent. 100 Nev. at 648 n. 5, 691 P.2d at 855. The question of terminating parental rights in cases of faultlessly incapacitated or handicapped persons is an open question and a serious question that was mentioned but not discussed or decided in Champagne. Strangely, the majority does not cite or refer to Champagne and merely relies on NRS 128.106 which states that in determining the neglect or unfitness of a parent, the court "shall consider" the "mental deficiency of the parent which renders the parent consistently unable to care for the immediate and continuing physical or psychological needs of the child for extended periods of time." The mentioned statute does not, of course, mandate the termination of parental rights of "intellectually challenged" parents and merely provides that the court must consider disabling mental deficiency as one factor in the determination of the jurisdictional ground of parental unfitness. As to when, if ever, mental deficiency can be the sole ground for parental severance, the legislation is silent. It is certainly arguable that parents should never lose their children just because the parents have a low I.Q. This is a subject that most certainly should have been addressed by the majority before affirming the judgment of the trial court. It was not.
The question of when, if ever, it is proper to take incapacitated or handicapped parents' children away from them is a chilling one. I wonder what the attitude of the majority would be if a physical deficiency, say quadriplegia, had rendered the Bushes unable to "reach the level of sufficiency to meet the physical and emotional needs of their children." I wonder if, in the minds of the majority justices, mental deficiency is considered to be any more or less disabling than physical deficiency. I wonder how a sensitive and thoughtful majority would apply the standard of "irremediable inability to function" as a parent to the facts of this case. I tend to question, even under the "irremediable inability" language of Champagne, whether it is ever morally or constitutionally permissible to terminate the parental rights of a fault-free parent.[3]
*951 I am not, under the present circumstances, obliged, as a minority jurist, to undertake an answer to these questions. This is the duty of the majority. I do know, however, that until these and other related questions are answered, the majority has no business concluding that there are jurisdictional grounds for permanently depriving the handicapped Bushes of their children.
This is a profound and troubling case. With regard to the jurisdictional grounds of "unfitness" and "failure to adjust," relied upon by the trial court, this appellate court is not presently in a position to decide whether these grounds have been proven by clear and convincing evidence. I say this because the majority has not attempted to apply any articulated principles of law to the particular circumstances of this case.[4] My first ground for dissent, then, is that the jurisdictional grounds of unfitness and failure to adjust have not been adequately defined in the majority opinion for cases involving innocently handicapped parents and that, consequently, these grounds cannot possibly have been established (clearly, convincingly or otherwise) as jurisdictional grounds for termination.
I next address the questions relating to the so-called "dispositional grounds" in this case. The focus of dispositional grounds is "the welfare of the child." Champagne, 100 Nev. at 653, 691 P.2d at 858. In the decision of the trial court, recognizing the holding in Champagne, the district judge properly noted that dispositional grounds exist only "if under no reasonable circumstances the child's best interest can be served by sustaining the parental tie." This strict rule, obviously, is a far cry from saying that a child would be better off in Home A than he would be in Home B and that he should, therefore, be permanently placed in Home A, with his natural parental ties being permanently cut off.
As I read this record, I see that the Welfare Division has done a remarkably good job in finding foster parents who are willing to adopt these "developmentally delayed" children. The children have been with the foster parents going on five years; and the children, the trial court tells us, have "bonded" with the foster parents. It is hard to deny that at the present time the children would probably be better off staying in the foster home than placing them abruptly back into the now-alien home of the natural parents. But, I am not urging an immediate transfer of custody. I only question the propriety of permanent severance of parental ties. My point is that I believe that in this case there are reasonable circumstances under which the children's interest could be served by sustaining the parental ties and that, consequently, the requirement of dispositional grounds has not been met.
*952 I do not think that it can be safely said that there are no reasonable circumstances which would permit maintaining the Bushes' parental relationship. Early on, shortly after the children were placed in foster care, the assigned welfare worker opined, in April of 1993, that the best interests of the child would be served by long-term foster care rather than termination of parental rights. The option of long-term foster care provides such a "reasonable circumstance"; and it is certainly an option that should have been considered in April 1993 and should have been considered by the trial court in this case.
Sadly enough, it appears to me likely that it is now the policy of the State to take children away from "inadequate" parents (see footnote 5) and find them a better home and to use the "best interests of the child" as the sole, criterion in determining whether to pursue a termination of parental rights action. Many of us today would not have been allowed to remain with our parents if the only basis for permanently taking us away from our parents was that there were some better parents around the corner.
In Champagne we held that the "[s]everance of parental rights is an exercise of awesome power, a power which we `question closely,'" id. at 645, 691 P.2d at 853 (citation omitted) and explained that there are constitutional and "`fundamental liberty interests of the natural parents in the care, custody and management of their child,'" id. at 647, 691 P.2d at 854 (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982)). These fundamental interests, we declared, quoting Santosky, do "`not evaporate simply because they have not been model parents or have lost temporary custody of the child to the State.'" Id. at 647, 691 P.2d at 854 (quoting Santosky, 455 U.S. at 753, 102 S.Ct. at 1394). We have here a rather typical example of parents who are not "model parents" and who probably can fairly be described as "inadequate" parents.[5]
*953 The predominant reason that I can see in this record that the trial court took the Bushes' children away from them permanently was that the court saw the children as being better off in the foster home than they would have been in their own home. The termination decision appears to have been based on a determination that the foster home was now the better of the two possible homes for the children.
In Champagne, we decried the application of a rule which based the termination decision on such factors as whether the child "has become integrated"[6] into a foster family. Id. at 650 n. 6, 691 P.2d at 856 (quoting NRS 128.108). To terminate parental rights in this case is to accept the unproved dogma of those psychiatrists who see the best interests of the child as the sole determining factor in termination cases and who would have the courts decide the question of parental severance based on an odious comparison between the real parents and the foster parents "to see who can best give the child love, affection and guidance and to continue the education of the child ... and who has the capacity ... to provide the child with food, clothing and medical care ... [and the] moral fitness, physical and mental health." Id. A "foster parent who has established a relationship with a child would take precedence over a natural parent, even if the natural parent has lost custody of the child through no fault of his own." Id. at 649 n. 6, 691 P.2d at 856. Under such a theory, if a child who has been removed from her home had been "temporarily" placed in the home of Daddy Warbucks, the natural parents would have had it. Daddy Warbucks can surely provide better food, clothing and housing and presumably can do a better job in affording "guidance and to continue the education of the child" who has been removed from a home because of "neglect" or some other parental failing; still, we cannot properly base a decision to terminate parental rights on a judgment as to whether a child is better off with his parents or in some richer environment in the home of some "surrogate" parents.
The point that I make is that we should not, morally or constitutionally, simply put the child on the scale and weigh to see which, the natural or the replacement parent, will better serve the "best interests of the child." The parents in this case have a low I.Q. and have had a terrible time trying to jump through all of the hoops that the Welfare Division introduced as a condition to their keeping their children. The Bushes have satisfactorily raised another child, and it seems to me that it is reasonable to conclude that with a little more help and a little more patience, the Bushes could have raised their now-lost children.
The more extreme of those jurists and social engineers who support "best interests" as the sole decisional criterion for permanently severing parental ties with children who have "bonded" and "integrated" with replacement parents would apply a simple *954 weighing test in which the question is asked: "In which of the two homes would the best interests of the child be served?" Champagne was a repudiation of such a weighing approach. This court recognized in Champagne that "[t]ermination of parental rights is essentially, of course, a statutory proceeding; but the statute does not say it all. Overlying constitutional considerations," 100 Nev. at 663, 691 P.2d at 864, must be taken into account; thus, there must be either a showing that a parent is "unsuitable" by reason of having been guilty of such "persistent fault or state of incapacity" as to deserve to have his or her parental rights terminated or that the parent has "sacrifice[d] parental rights in the interest of the child, by reason of irremediable inability to function as a proper and acceptable parent," id. at 648 n. 5, 691 P.2d at 858. This is the first time that this court has had an opportunity to examine and discuss this kind of "sacrifice" of parenthood. In refusing to do so it does a disservice to faultlessly incapacitated parents such as the Bushes and to other similarly situated handicapped parents who are threatened in the future.
This is a case in which the decree terminating the Bushes' parental rights decree should be reversed; therefore I dissent.
NOTES
[1] For example, in Glover v. Alabama Dept. of Pensions and Sec., 401 So.2d 786 (Ala.Civ.App. 1981), the court's decision to reverse the order of termination turned on the state's failure to establish that termination presented a viable alternative to better serve the future welfare of the children. Id. at 788. The court concluded that it was unlikely that the children would be adopted. Id. The mother had a low I.Q. but was "functional." Id. She also had little income "and has been less than successful in meeting some of the goals set by her caseworkers over the years." Id.
[2] In two cases cited by appellants, the court reversed termination orders because the state failed to provide services. In In re Victoria M., 207 Cal.App.3d 1317, 255 Cal.Rptr. 498, 499-500 (1989), the father had abandoned the children and the mother was "in the borderline range of intelligence." No accommodation was made for the mother's special needs in providing services so that she could be reunified with her children, and her disabilities were not considered in determining what services would best suit her needs. The court reversed the termination order, concluding that "the rights of a developmentally disabled parent may not be terminated without first assessing whether the services offered by the state through regional centers may enable the family of a disabled person to remain intact." Id. In In re Hickman, 489 So.2d 601, 602 (Ala. Civ.App.1986), the court concluded that termination was not supported by sufficient evidence where the reasons behind termination were poverty and the "limited mentality" of the mother; thus the court reversed and remanded. The agency seeking termination had not provided the family with any aid.
[1] There is some evidence in the record that the Bushes were at times frustrated, uncooperative and even "hostile" to State officials; but, overall, it is quite clear that the court rested its decision on the Bushes' inability to become adequate parents rather than on any fault or willful misconduct or derelictions on their part.
[2] As I see it, the Bushes' incapacities and their not having an attorney during the neglect proceedings when their children were first taken away from them is far more important than their having an attorney at the termination hearing. By the time of the termination hearing they had already lost the game. Their children had been able to see them only briefly on fairly infrequent occasions, and the children, naturally (to use psychiatric jargon) "bonded" with their foster parents. Every day that the children were out of the Bush home made it more difficult for the supposed desideratum, "reunification," to take place. If these parents had had a truly dedicated attorney or a CASA volunteer who was something other than a surrogate agent for the State, this would, in my opinion, have been an entirely different case.
[3] The recent court cases involving misidentified babies who are inadvertently "switched" at birth comes to mind. It occurs to me that when a natural parent comes to court ten or fifteen years after the unfortunate switch, seeking return of her or his natural child, the court might properly and morally decide that, innocent or not, such a parent should not be entitled to the return of her or his child and that perhaps termination of parental rights of that faultless parent, rather than removal of the child from the parents who raised the child, might be in order, solely because at that point in time the best interest of the child might demand that the "wrong" parent be awarded legal parenthood. Also, perhaps it might be at least thinkable to consider terminating the parental rights of a parent who was in an irreversible comatose and vegetative state, if it was very clearly and convincingly necessary and in the best interests of a child to do so. I footnote these kinds of situations because it seems to me that only in the rarest and most unusual of cases (if ever) would it be morally proper to terminate the parental rights of an innocently incapacitated or handicapped parent who was begging the court not to terminate parental rights. Certainly I would want to resist the severance of parental ties of any parent who was having trouble raising a child because of a handicap, especially when the parent was earnestly trying to avert the "capital punishment" of welfare law. As appears from the position that I take in the text, I would vote "no" on the question of whether "unfitness" of the Bushes was established by clear and convincing evidence.
[4] I agree, incidentally, with the majority's view that the "evidence supporting both parental unfitness and parental failure to adjust is essentially the same in this case." The question in this case boils down to whether an "inability" to conform to the parenting plan laid down by the Welfare Division can support a conclusion of either parental unfitness or parental failure to adjust. I have a particular problem in this case with the failure-to-adjust jurisdictional ground. As we pointed out in Champagne, the "idea of permanently taking a child from a parent by reason of the parent's failing to adjust to `circumstances, conduct or conditions' prescribed by the state is an idea that is new to public family law." 100 Nev. at 651, 691 P.2d at 857. Caution in such cases is necessary

because of the vast power differential between the state and the welfare client, the paucity of truly efficacious `services' that are or can be made available to the client, the usually greatly diminished contact between welfare client-parents and the removed child and the oft-seen ineptitude of the so-called `inadequate' parent.
Id.
Significantly, in Champagne, we noted that "[f]ailure of parental adjustment may provide a jurisdictional basis for termination, but it is fraught with difficulties and must be applied with caution." Id. at 652, 691 P.2d at 857. I find no such caution to have been exercised in this case. I find a certain degree of impatience on the part of agents of the Welfare Division, and I find as the principle motivating force behind Welfare decisions in this case to be a desire to place the children in a better home than they had in the home of their poor and intellectually limited parents. This is not the kind of caution that Champagne was talking about. Champagne teaches that the courts should be cautious not to take children away from their natural parents absent a clear showing of "fault or incapacitation." Id. at 651, 691 P.2d at 857. What means "incapacitation" is the center of this controversy and a subject that is not even mentioned in the majority opinion.
[5] The term "inadequate" seems to me to describe the Bushes fairly accurately. Footnote 7 in Champagne poignantly describes these kinds of parents and argues that such parents do not deserve to lose their children. The footnote bears repeating, in part, in this dissenting opinion:

While no empirical studies provide a statistical breakdown of the reasons for intervention in neglect cases, probably the largest category of cases involves persons thought to be "inadequate parents." All commentators agree that the great majority of neglect cases involve very poor families who are usually receiving welfare. Most of the parents are not merely poor, however. In addition to the problems directly caused by the poverty ... many of these parents can be described as extremely "marginal" people, that is they are continually at the borderline of being able to sustain themselves  economically, emotionally, and mentally.
Their plight is reflected in their home situations. Their homes are often dirty and run-down. Feeding arrangements are haphazard. One or both parents may ... be retarded, which may affect the quality of their child care....
Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement....
It is certainly very tempting to intervene to help such children. Intervention might be justified both to protect the children by providing them with an environment in which they can better reach their potential and to protect the state, since it is claimed that such children will probably end up as delinquents, criminals, or welfare recipients. Without intervention, we may be perpetuating a "culture of poverty."
Despite the appeal of these arguments, parental "inadequacy" in and of itself should not be a basis for intervention, other than the offer of services available on a truly voluntary basis. The term "inadequate home" or "inadequate parent" is even harder to define than emotional neglect. There is certainly no consensus about what types of "inadequate" behavior would justify intervention. Given the vagueness of the standard, almost unlimited intervention would be possible.
.... In fact, by focusing solely on parental behavior, child-care workers often ignore the many strengths a given child may be deriving from his environment. As I have stressed, the complexity of the process by which a child relates to any environment defies any attempt to draft laws solely in terms of environmental influences.
Moreover, there is every reason to be extremely pessimistic about the utility of coercive intervention. The services necessary to help these families are generally unavailable. More day-care centers, home-makers, health facilities, and job training programs would all be needed if intervention were to mean anything more than periodic visits by a social worker. Such visits themselves are costly, have not been shown to be effective, and may be resented by the parent who will blame the child for the outside meddling.
Even when "inadequate" parents seek help, agencies often lack the resources or ability to alleviate undesirable home conditions. The chances of success are even lower when the family resists intervention. Few communities have sufficient personnel and programs to permit meaningful intervention, even in cases involving physical abuse or severe emotional damage. It is highly questionable whether limited resources ought to be expended on families with less severe problems, unless the families request services or accept them voluntarily.
Furthermore, when parents do not respond to the "treater," the next step is to remove the children. Yet there is no evidence demonstrating that children from such families are helped through placement.
In an ideal world, children would not be brought up in "inadequate" homes. However, our less than ideal society lacks the ability to provide better alternatives for these children. The best we can do is to expand the social welfare services now offered families on a voluntary basis.
Champagne, 100 Nev. at 654 n. 7, 691 P.2d at 858.
[6] I note that NRS 128.108 requires the court to "consider whether the child has become integrated into the foster family" and the "capacity and disposition of the child's parents from whom the child was removed as compared with that of the foster family to provide the child with food, clothing" and all the many other goodies that the child was probably deprived of to some extent in his natural but "inadequate" parental home. (See footnote 5).