B.B.T. ("the father") appeals from the Houston Juvenile Court's judgment of April 5, 2007, terminating his parental rights to K.T. ("the child"). We reverse and remand.
 Background
A.H. ("the mother") gave birth to the child on February 20, 2002. The father, who was living with, but not married to, the mother at the time, signed the birth certificate as the father. The couple subsequently ended their relationship; the mother retained physical custody of the child. On June 3, 2003, the Houston County Department of Human Resources ("DHR") obtained custody of the child, along with three of the child's half siblings. On October 21, 2005, DHR filed a petition to terminate the mother's parental rights to the child and to terminate the parental rights of, as DHR put it, the "unknown father" of the child. On April 25, 2006, DHR obtained DNA test results indicating that B.B.T. was the biological father of the child. The father filed a petition to obtain custody of the child on August 3, 2006. After four ore tenus hearings occurring on November 21, 2006, December 18, 2006, February 1, 2007, and March 13, 2007, the juvenile court entered a judgment terminating the mother's and the father's parental rights to the child.[1] The father appeals, asserting that the evidence presented to the juvenile court was insufficient to support the termination of his parental rights.
 Standard of Review and Applicable Law
In cases in which a parent challenges the sufficiency of the evidence to support a termination of his or her parental rights, this court is required to conduct a "careful search of the record," see Moore v. State Dep't of Pensions Sec, 470 So.2d 1269, 1270 (Ala.Civ.App. 1985), to determine if clear and convincing evidence supports the judgment.Columbus v. State Dep't of Human Res., 523 So.2d 419,421 (Ala.Civ.App. 1987); see also L.M. v. D.D.F.,840 So.2d 171, 179 (Ala.Civ.App. 2002) ("Due to the serious nature of the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."); Santosky v. Kramer, 455 U.S. 745,102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that due process allows parental rights to be terminated only upon clear and convincing evidence of unfitness); and Ala. Code 1975, § 26-18-7(a) (requiring clear and convincing evidence to support an order terminating parental rights). "`"[C]lear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" Ex parte T.V., 971 So.2d 1, 9
(Ala. 2007) (quoting L.M. v. D.D.F., 840 So.2d at 179, quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).
Section 26-18-7(a), Ala. Code 1975, a part of the 1984 Child Protection Act, § 26-18-1 et seq., Ala. Code 1975, sets forth the law regarding the termination of *Page 481 
parental rights. That section provides, in part:
 "If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
Our supreme court has declared that before a juvenile court may terminate parental rights, it must find that one of the statutory grounds for termination exist and that there is no other viable alternative to termination. See Ex parteBeasley, 564 So.2d 950, 954 (Ala. 1990).
In this case, the juvenile court found that the father was unable or unwilling to discharge his parental responsibilities to and for the child and that no viable alternative to termination of his parental rights existed. On review, we are charged with the duty to determine if those factual findings are supported by clear and convincing evidence.
 Evidence Presented at the Termination Hearing
The evidence at the termination hearing established that the father and the mother lived together for approximately two years before the birth of the child and lived together for a few months after the child's birth. The mother testified that the father used drugs but that he only used them when they were separated and that he never used them around the child. According to the mother, the father was a "good daddy" to the child so she never reported his drug use to legal authorities. The mother testified that approximately two years before the March 13, 2007, termination hearing she had found the father's drug paraphernalia and had thrown it away. At that time, the father had indicated to the mother that he would no longer use drugs. At the time of the termination hearing, however, the mother believed that the father was still using drugs because she had heard that he was using drugs from her and the father's mutual friends. The mother testified that she had informed DHR of the father's alleged drug use one week before the March 13, 2007, termination hearing. The record contains no evidence indicating that DHR had requested a drug test from the father to confirm the mother's testimony.
The father testified that he had maintained contact with the child except for one unspecified year after her birth. He also testified that he occasionally gave the mother money for child support, but that he had never been ordered by a court to pay child support. The father testified that he loved the child and wanted the child to be part of his life.
After the father had petitioned the court to obtain custody of the child, Suzanne Hatton of the Coffee County Department of Human Resources performed a home study regarding the father. Hatton found the father living in a clean and well-kept four-bedroom, two-bath house that was suitable for raising children. The father worked as the head cook at a local restaurant, bringing home $450 per week. Hatton discovered that the father had been convicted of driving under the influence in 2003, but she found no other criminal record.
Hatton interviewed the father's girlfriend during the home study. The girl-friend indicated that she had three children, none of which were the father's biological children. She indicated that the father had a good relationship with *Page 482 
her children, who had lived with her and the father. The father and his girl-friend had recently split following an argument; however, they had since worked things out, and the girlfriend indicated that she intended to move herself and her children back into the house with the father. The girlfriend also indicated that she and the father had gotten into a physical altercation during which she fell and dislocated her jaw; she did not indicate how long ago that altercation had taken place. The girlfriend denied that the father had ever committed any acts of domestic violence in the presence of any child. The girlfriend further informed Hatton that the father drank alcohol.
Hatton testified that she believed the father was sincere in his desire to obtain custody of the child. Hatton also testified as follows:
 "[COUNSEL FOR THE FATHER]: In this home evaluation, did you see or hear anything that would indicate to you that [the father] could not take care of his daughter?
 "HATTON: The only concern I had was about his drinking, and he did express to me that he was trying to quit."
Hatton further testified:
 "[COUNSEL FOR THE MOTHER]: At this point do you consider [the father] an option for [the child]? Do you feel like either now or in the future that they could be reunited?
 "HATTON: It would be difficult for me to say whether or not he would be a proper parent for her or not. He seems to care about his daughter. There are issues that need to be corrected probably down the line that would make him probably a suitable parent, but I cannot say yes or no to that."
Before DNA testing confirmed his paternity of the child, the father regularly visited the child and the child's half siblings. After DNA testing confirmed his paternity, he visited the child every week but one, which he missed because of automobile trouble. The father would often bring snacks and presents for the children. A DHR representative testified that three of the children, including the child, had accused the father of serving beer to the child and one of the child's half sisters on an unsupervised visit in December 2005. Some evidence indicates that the children later recanted this accusation. Although the DHR representative testified that DHR had determined these allegations to be true, DHR's attorney stipulated to the following at the March 13, 2007, termination hearing:
 "[DHR's COUNSEL]: Judge, on the information that I have and that DHR has, all of the visitations have been in order, proper, and they have been accommodating and there's love and tenderness there. There's a good relationship between [the father] and the child, and that's a matter of record."
The father testified that he continued to work as the head cook at the restaurant from 9:00 a.m. to 2:00 p.m. and from 3:30 p.m. to 9:00 p.m. He testified that he was financially capable of taking care of the child. He also stated that his girlfriend sometimes worked, but she was not working at the time of the hearing. He indicated that he planned to marry the girlfriend at some point. The father admitted that he still drank alcohol, but he denied ever abusing his girlfriend.
 Grounds for Termination
DHR failed to present clear and convincing evidence that the father was unable or unwilling to discharge his parental responsibilities to and for the child. The father testified unequivocally that he wanted to care for and support the child. He *Page 483 
maintained constant contact with the child through weekly visits even before he was determined to be the child's biological father. The mother testified that the father was a "good daddy." Hatton testified that the father seemed sincere in his desire to obtain custody of the child. The evidence shows without contradiction that the father was willing to discharge his responsibilities to and for the child.
The father maintained suitable housing with a live-in girlfriend who he planned to marry. Hatton testified that the father's relationship with the girlfriend's three children was good. The father testified that he was financially capable of taking care of the child. DHR stipulated that the father had a loving and tender relationship with the child. That evidence establishes that the father is able to discharge his responsibilities to and for the child.
Hatton testified that she had a concern that the father's drinking may prevent him from properly parenting the child. However, DHR presented absolutely no evidence indicating that the father consumed alcohol excessively or for such duration as to impair his ability to properly care for the child.See Ala. Code 1975, § 26-18-7(a)(2) (requiring juvenile court to consider "excessive use of alcohol . . . of such duration or nature as to render the parent unable to care for [the] needs of the child").
In its judgment, the juvenile court mentioned that the father had "a history of domestic violence"; however, the evidence indicated that the father had been accused of one act of domestic violence. The evidence was undisputed that the father had never committed any act of domestic violence in front of a child. The record further contains no evidence indicating that the father had ever threatened a child, much less committed an act of physical violence against a child. Moreover, Hatton, who was aware of the girlfriend's accusation of domestic abuse, indicated that her only concern regarding the father's parenting ability was his drinking. Apparently, Hatton did not consider the father a threat to commit domestic violence against a child. A juvenile court may consider a parent's propensity for domestic violence, but only insofar as that trait relates to the parent's ability to discharge his or her parental responsibilities to and for a child. See
Ala. Code 1975, § 26-18-7(a). The record does not contain clear and convincing evidence that the father's one episode of alleged domestic violence impairs his ability to properly parent the child.
In its judgment terminating the father's parental rights, the juvenile court did not mention the report that the father had provided beer to the child on December 30, 2005. The juvenile court evidently concluded, consistent with DHR's admission at trial, that the father had acted appropriately during all visitations. At any rate, the record does not contain clear and convincing evidence that the father is unable to discharge his parental responsibilities to and for the child.
Because the record does not contain clear and convincing evidence of the sole ground upon which the juvenile court terminated the father's parental rights, we are compelled to reverse the trial court's judgment terminating the father's parental rights. We need not address the father's second argument regarding viable alternatives. The case is remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur in the result, without writing.
BRYAN, J., dissents, without writing.
[1] The mother has appealed from the judgment terminating her parental rights; that appeal has been assigned a different case number. The termination of the mother's parental rights are not at issue in this appeal. *Page 484