1 So.3d 53 (2008)
A.D.B.H.
v.
HOUSTON COUNTY DEPARTMENT OF HUMAN RESOURCES.
2060699.
Court of Civil Appeals of Alabama.
March 21, 2008.
Rehearing Denied June 20, 2008.
Certiorari Denied August 8, 2008 Alabama Supreme Court 1071338.
*54 Benjamin J. Freeman of Prim, Freeman & Mendheim, L.L.C., Dothan, for appellant.
*55 Troy King, atty. gen., and Sharon E. Ficquette and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
PER CURIAM.
This is a termination-of-parental-rights case. On October 21, 2005, the Houston County Department of Human Resources petitioned to terminate A.D.B.H.'s parental rights to two of her children, J.B. and K.T. The Houston Juvenile Court held hearings on the petition on November 21, 2006, December 18, 2006, February 1, 2007, and March 13, 2007. The juvenile court terminated A.D.B.H.'s parental rights to J.B. and K.T. on April 5, 2007.
A.D.B.H. ("the mother") gave birth to J.B. on August 20, 1999, and to K.T. on February 20, 2002. In October 2002, the mother lost custody of her childrenJ.B., K.T., M.D., and K.M., who are all half siblingsafter the Houston County Department of Human Resources ("DHR") concluded that the mother's home was unsafe and unsanitary. By the next month, the mother's father and stepmother ("the maternal grandparents") had obtained physical custody of all four children. In March 2003, the maternal grandfather also obtained legal custody of the children. However, the mother subsequently regained custody of the children in June 2003. Upon regaining custody of the children, the mother received family services through DHR. Despite the mother's having received those services, J.B. was transferred to a foster home in late 2003 because of severe behavioral problems.
Betty Faircloth, a DHR caseworker, testified that she became involved in the case in February 2004. At that time, three of the children were residing with the mother, while J.B., who had been diagnosed with attention deficit/hyperactivity disorder ("ADHD") and had been prescribed numerous medications to control his behavior, remained in a foster home. J.B. would visit with the family every other weekend from Friday to Monday morning. Faircloth testified that the mother routinely telephoned her at 8:00 a.m. on Monday mornings to request that she come and get J.B. because the mother could not handle his behavior, which included insomnia, violence towards his half sisters, and a disrespectful attitude. In addition, on several occasions, the mother, when she was upset, requested that Faircloth take all four children. Faircloth testified, however, that the mother was able to handle the other three children and that she wanted all of her children, but that the mother simply could not handle any conflict with J.B. and that she often failed to properly administer his medications despite her knowledge of their importance.
Faircloth testified that she attempted to keep the children with the mother as long as possible but that the children were removed from the mother's home in August 2004. Faircloth testified that the mother had failed to address the children's chronic head-lice problem, that another family had moved into the mother's home, and that the mother was leaving the children with neighbors or whomever would care for them. Faircloth testified that the home environment had become unsanitary and unsafe.
The three children who had been residing with the mother, including K.T., were initially transferred to a traditional foster home. In August 2004, M.D. was placed in the custody of her paternal grandmother. J.B. remained in a separate foster home until October 2004. Although the foster parents were able to control J.B. with the aid of his medications, the foster mother recommended in October 2004 that he be transferred to a therapeutic foster *56 home that could better address his special behavioral problems.
Linda Shirey, J.B.'s therapist, testified that she had counseled J.B. approximately every other week since April 12, 2004. According to Shirey, when J.B. started therapy, he was developmentally behind and withdrawn, his speech was very hard to understand, he was very emotional, and he had a very short attention span. Shirey described him as "a disturbed child." Shirey testified that she had often attempted to integrate the mother into J.B.'s counseling sessions but that the mother had attended his sessions only twice. Shirey testified that the mother had a very negative effect on J.B., causing him "a lot of problems." Faircloth testified that she considered J.B. to be a "target child," who the mother, and even the half sisters, would blame for any problems the family encountered. During 2004, J.B. expressed sadness that he was not seeing his half sisters, but he never expressed similar feelings about not seeing his mother.
After the children were removed from her home in 2004, the mother received visitation rights that she exercised at DHR's offices. Faircloth testified that the mother would visit with all four children at the same time on a weekly basis for one hour and that, during that time, the mother would spend approximately 40 minutes on her cellular telephone. Sometimes she would be talking to B.B.T., K.T.'s father, or to her parents, and she would pass the telephone to the children so they could speak with them briefly. However, the mother would often spend most of her time talking on the telephone rather than visiting with the children. Sometimes she would be talking to a man to whom she was engaged who had never met the children. Faircloth testified that she felt the mother spent an inappropriate amount of time talking on the telephone rather than visiting with her children.
Judy Whatley, another caseworker, testified that she had observed the visitations between the mother and the children in 2004. Whatley testified that during the visits the mother spent 20 minutes to 1 hour on her cellular telephone speaking to someone in Spanish and that, as a result, there was very little interaction between the mother and the children. Whatley testified that M.D., who was nine years old at the time, would basically take care of the younger children, taking them to the bathroom, unwrapping their hamburgers, tying their shoes, and cleaning up after them, while the mother talked on the telephone. Whatley testified that the mother constantly questioned the children about what color they were, insisting that they were brown, not white.
Faircloth testified that in 2004 and 2005 the mother would make intermittent progress with the children but that, for every step forward, she would take two steps back. Faircloth worked with the mother on a daily basis to assist the mother with correcting the problems DHR had identified. The mother never progressed to the point at which the children could be returned to her, however.
In March 2005, J.B. was able to leave the therapeutic foster home and move to the traditional foster home with K.T. and K.M. At trial, Shirey testified that J.B. had blossomed since leaving the therapeutic foster home and that he was now a developmentally normal and happy child. She testified, however, that J.B. still had no attachment to the mother. Shirey also testified that J.B. remained very close to his half sisters.
In March 2006, the juvenile court awarded custody of K.M. to her father, who lived in Atlanta. In the custody order the juvenile court indicated that "there is no ordered *57 visitation pending further order of the court." Based on this order, DHR suspended all visitation between the mother and K.M., as well as the other children. The mother did not petition to reinstate visitation, and, as a result, the mother did not visit with the children after March 2006. Before that, the mother had been consistent with visitation and telephone calls, although she had occasionally missed a visit.
Whatley testified that DHR offered many services to the mother in an attempt to rehabilitate her, including providing day-care services, food stamps, child support, financial support, Christmas presents, transportation, counseling and psychiatric services, domestic-violence services, psychological evaluations, parent coaching, and services through Family Options, but, she testified, the mother was resistant to DHR's efforts and failed to adjust to the needs of the children. Services were interrupted or halted because of noncompliance or other issues traceable to the mother.
According to Whatley's testimony, during the time Whatley oversaw the case, the mother never showed any stability. Whatley testified that since 1995 the mother had worked at 35 different jobs, working the longest for a grocery store for 6 months. Since 1998, the mother had lived at 39 different residences; however, the mother had lived at the same address in Headland since August 2005, although sometimes her mail would stack up, indicating that she was not staying there. The mother was combative and threatening to her caseworkers and at least one foster parent, but not to her children. The mother had been barred from J.B.'s pediatrician's office because of her failure to comply with the medical advice given for the children. The mother fed the children candy at visitations, although she had been cautioned that candy would make the children hyperactive. According to Whatley, the mother continued to be emotionally abusive to J.B., although she has never been physically abusive to any of her other children and the children had never exhibited any signs of physical injury. Whatley testified that the mother had not paid any child support since October 2005 and that a warrant had been issued for the mother's arrest for her having failed to appear in court on the child-support matter. The mother had no criminal history.
The Henry County Department of Human Resources ("the Henry County DHR") performed a home study on the mother's residence in October 2005. According to Whatley's testimony, the Henry County DHR did not approve placing the children into the mother's home at that time. The Henry County DHR representative determined that the mother had lied about her employment, stating she was working when, in fact, she had been discharged four days before the home study because of her constant controversial conduct. The representative also found that the home had only one furnished bedroom. A few weeks before the initial termination-of-parental-rights hearing, a second home study was conducted. At that time, all three bedrooms were furnished and the home was clean. Whatley testified that it appeared that the mother had corrected the cleanliness problem. Faircloth testified that the mother had shown the ability to properly maintain the home when residing with her new husband, but that she had never shown the ability to properly maintain the home with all of her children residing with her.
Robert Nolan, a clinical psychologist, testified that he had evaluated the mother in January and February 2006. Nolan indicated that the mother had grown up in an unstable environment and that she had *58 been diagnosed and was being treated for bipolar disorder, a problematic, but treatable biological condition that causes altered mood patterns. He opined that the mother, due to her own unstable upbringing and her mental-health issues, would have difficulty providing a stable and nurturing environment for her own children. Although Nolan admitted that treatment of the mother's bipolar disorder, if "wonderfully effective," could possibly lead to the significant changes necessary for the mother to change her patterns and become a stable and nurturing influence to her children, such treatment, if both effective and fully complied with by the mother, only "might" benefit the mother. He noted that the mother had yet to admit that the situation in which she found herself was due, in large part, to her own poor judgment. In fact, Nolan pointed out that the mother blamed others for her children being taken into DHR's custody. In his report, Nolan concluded that
"[g]iven the family history, the parent-child relationships are likely to be rather difficult to manage [as] a result of the instability of attachment and instability of home environment that has occurred, and the children will require a skillful, insightful, adaptive, and personally very stable parenting figure. These will be special needs children in terms of their emotional development and it will be critical that those needs are met during these earlier years of their lives, which will require that they have stable placements and attachments with nurturing parenting figures. It is not evident that their mother can be that person at this time."
DHR placed into evidence a September 2006 letter from Dr. Jerlyn C. McLeod, an expert in child and adolescent psychiatry. Dr. McLeod had examined and treated J.B. Dr. McLeod diagnosed J.B. with "ADHD Combined Type, Mood Disorder, and Enuresis" for which he was treating J.B. with the prescription medications Adderall, Seroquel, and Remeron. Dr. McLeod stated that he was most concerned with J.B.'s emotional stability. Dr. McLeod felt that J.B. would remain stable only so long as he stayed out of the mother's home and was kept in a structured and safe environment. Dr. McLeod felt J.B. could succeed in his current placement and that J.B. should continue psychiatric care and medication to avoid future hospitalizations. DHR also placed into evidence a December 2006 letter from Shirey in which she opined that J.B. had stabilized since his visitations with his mother had ceased and recommended that the mother have no further visitation with J.B. to assure his continued emotional and psychological well-being.
In September 2006, the mother was admitted to a local hospital emergency room for an intentional overdose of prescription medication. The emergency-room physician diagnosed the mother with bipolar disorder and felt she had attempted suicide after becoming despondent about not being able to see her children. A psychiatrist evaluated the mother and found that she was not an acute suicide risk, but he opined that the mother was quite unstable and was having difficulty functioning and making rational decisions. He diagnosed the mother with an adjustment disorder with major depression, along with medical noncompliance and parent-child relational problems.
The mother introduced into evidence two letters from Nathan Shimer, the mother's counselor, dated November 2004 and December 2005. In the November 2004 letter, Shimer indicated that the mother was, at that time, compliant with her medication regimen, although the mother had deemed the medication insufficient to treat *59 the stress and worry generated by the dependency case. Shimer further noted in the November 2004 letter that the mother was stable and that she should not become unstable again if she continued to take her medication regularly. In the December 2005 letter, Shimer opined that the mother was a strong advocate for her children whose maternal instinctual responses had been misread by some. He believed the mother loved and worried about her children, but not always in a conventional manner. He described the mother as a typical Latino mother, noting that although she was not Latino by birth, she had been assimilated into the Latino culture. Shimer opined that it would be in the children's best interests to be returned to the mother, who he described as a loving and nurturing parent.
The mother testified that in February 2007 she was not employed but that she occasionally worked as a translator for the City of Dothan and also cleaned houses. She said that she lived in Headland with her third husband, who was a construction worker. She earned $180 from the City of Dothan for the 11-month period immediately before September 2006. The mother testified that she was not actively seeking employment but stated that she had filed for Social Security disability benefits. Despite her unemployment, the mother testified that she had paid some child support since October 2005.
The mother testified that she had been diagnosed with bipolar disorder and attention deficit disorder. A local psychiatrist was actively treating her for those conditions at the time of the hearing in February 2007. The doctor had prescribed Ritalin to help the mother's attention, Seroquel to help stabilize the mother's moods, and Lamictal to treat the mother's bipolar disorder. The mother also used the prescription medications Ambien as a sleep aid and Xanax for her nerves, as needed. The mother testified that her medications helped her focus and that she did not know whether she would have to continue taking the medications in the future. However, she testified that her dosages were stronger at the time of the February 2007 hearing than they had been previously. The mother was also undergoing therapeutic counseling. The mother admitted that she had had suicidal thoughts in September 2006, but she denied that she had attempted suicide at that time or in 2004 or 2005.
The mother testified that since March 2006 she had had no contact with DHR, except during Christmastime of 2006, when she asked her attorney to have DHR specify any requirements she needed to meet in order to regain custody of her children. The mother testified that she had done everything she had been asked to do and everything that she knew to do to regain custody. The mother testified that she kept a clean house and that, although DHR had never asked her to maintain stable housing, she had been living in the same residence for over two years. The mother testified that she had addressed DHR's concerns about having multiple family members living with her. The mother testified that she was only $700 in arrears on her child support and that she was paying on those arrears. The mother also testified that she took her medication to appease DHR and to address her emotional problems from having her children taken away from her. The mother testified that she had attended almost every visitation and that she had telephoned DHR when she could not attend the visitations because of sickness or other problems. The mother admitted that she had not contacted the children since March 2006, but she said she had done so because DHR had told her she would be arrested if she did. The mother denied being loud and threatening while *60 visiting with the children at DHR's facilities. The mother denied that she had asked Faircloth to pick up J.B. because she could not control him.
The mother testified that the maternal grandparents were willing to take custody of the children. The maternal grandparents had acted as custodians for all four children in 2002 and 2003, and, according to the mother's testimony, DHR had never complained about their conduct or expressed any concern about the maternal grandfather's behavior. At the time of the termination hearings, the maternal grandfather was on active duty with the Army. Although he was physically present in the state at the time of the February 2007 hearing, the maternal grandfather was on emergency leave to attend to the maternal stepgrandmother, who was in the hospital recuperating from hip surgery. Neither of the maternal grandparents had filed a petition to obtain custody of any of the children.
The juvenile court entered separate but largely identical judgments regarding J.B. and K.T., finding in each judgment that the respective child was dependent, that the mother was unable or unwilling to provide a stable home for that child, and that the mother was unable to care for or to provide for that child. The juvenile court further found that it and DHR had considered less drastic measures than termination of the mother's parental rights, but it concluded that there was no other reasonable and viable alternative to termination. Finding that it was in the best interests of both children, the juvenile court terminated the mother's parental rights to J.B. and K.T.[1] The mother appeals from both judgments.
The mother first argues that the judgments terminating her parental rights were not supported by clear and convincing evidence because the evidence showed that she was in the process of making the necessary steps to reunite with the children and that her current conditions indicated that she was able and willing to discharge her parental responsibilities to and for the children. The mother secondly argues that the judgments finding that there was no less drastic viable alternative to termination of her parental rights were unsupported by clear and convincing evidence because the juvenile court could have placed custody of the children with the maternal grandparents.
"`The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can *61 then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a)....'
"Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted).
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)."
B.M. v. State, 895 So.2d 319, 330-31 (Ala. Civ.App.2004).
As noted above, a juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court's factual findings, based on evidence presented ore tenus, in a judgment terminating parental rights are presumed correct. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App. 1995).
Section 26-18-7(a), Ala.Code 1975, a part of the 1984 Child Protection Act ("the CPA"), § 26-18-1 et seq., Ala.Code 1975, specifies grounds for terminating parental rights:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
In deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child, the juvenile court must consider such factors as:
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"....
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed."
Ala.Code 1975, § 26-18-7(a). Additionally, when the child is not in the physical custody of the parent, the juvenile court shall consider:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed *62 private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Ala.Code 1975, § 26-18-7(b).
In this case, the juvenile court originally removed the children from the mother's custody because she had failed to maintain a clean and suitable environment for the children. Although the children subsequently reunited with the mother, in late 2003 J.B. was transferred to a foster home because of the mother's inability to control his behavior and her inability to adapt to his special behavioral needs, including complying with his medication schedule. By August 2004, all the children had been removed from the mother's home because of her failure to correct their chronic head-lice problem, the overcrowded conditions of the home, the unsafe and unsanitary conditions of the yard and the home, and the mother's delegation of her parental responsibilities to whomever would care for the children. DHR later faulted the mother for failing to maintain steady employment and a stable residence.
As pointed out in the mother's brief on appeal, and by the mother's attorney at trial, by the time of the final hearing, the children no longer suffered from chronic head lice, the mother had remarried, the mother had maintained a clean and suitable home for over two years, the mother had cleared her residence to make room for her children, and the mother had indicated a willingness to care for the children by taking her medication to control her mood and attention problems. Based on this evidence, all of which was uncontradicted, the mother argues that she was making strides toward curing all the deficiencies that had led to the initial disruption of the family. The mother notes that "the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App. 2003). The mother argues that, pursuant to D.O., a juvenile court errs if it terminates parental rights prematurely at a time when the parent is making progress toward changing his or her circumstances and removing the barriers to reunification with the child. D.O., 859 So.2d at 444.
The problem with the mother's argument is that she assumes that, because she had thoroughly addressed some of the issues that had endangered the children during the more than two year period in which DHR had their custody, she was making significant progress toward reunification with the children. Both of the DHR representatives testified that, after DHR had obtained custody of the children, DHR's focus shifted away from the conditions of the home that had necessitated the removal of the children and toward the manner in which the mother interacted and treated the children. Having witnessed the mother's visitations with the children, Faircloth and Whatley concluded that the mother was emotionally abusive to J.B. and was neglectful of the other children, seeming to be more concerned with her own personal life than the needs of the children, conclusions they supported at trial with clear and convincing evidence. DHR attempted to address these problems *63 by providing counseling, parenting services, and other family services for the mother, to no avail. At the end of the process, the mother had identified a major factor in her problems, her bipolar disorder, and had stabilized her mood swings through medication, but she was still in a condition that led one mental-health professional to testify that the mother could not provide the necessary stability to properly care for and nurture the children and that led two others to opine that it would be detrimental to J.B. to be reunited with the mother. Although another mental-health professional indicated that the mother could and should regain custody of the children, it is the duty of the juvenile court to weigh the evidence and determine which expert opinion it believes. See State ex rel. D.K. v. R.T., 599 So.2d 627, 628 (Ala.Civ.App.1992).
Nolan indicated that the mother's psychiatric condition "might" be controlled sufficiently with medication to the point that she could resume custody of the children. "At some point, however, the child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." M.W. v. Houston County Dep't of Human Res., 773 So.2d 484, 487 (Ala. Civ.App.2000). When the juvenile court terminated the mother's parental rights, J.B. had been in DHR's custody and in various foster homes for almost four years and K.T. had been in foster care for almost two and one-half years. J.B. and K.T. had seen their two half siblings transferred to suitable relatives with stable home environments. The mother had been given ample time to rehabilitate herself so that she could regain custody of J.B. and K.T. The children should not have to spend further time in an uncertain home situation based on the mere hope that the mother may someday overcome her psychological inability to properly parent them. The juvenile court did not err in failing to grant the mother additional time to rehabilitate.
The mother further argues that the juvenile court erred by failing to consider viable alternatives to the termination of her parental rights. She argues that awarding custody to the maternal grandparents is a suitable alternative to the termination of her parental rights to both J.B. and K.T. DHR argues that the juvenile court properly rejected the maternal grandparents as viable relative resources because there was no evidence indicating that the maternal grandparents had maintained any relationship with the children and that the juvenile court had properly concluded that it would not be in the children's best interest to be placed with the maternal grandparents.
We have often cited Ex parte Beasley to explain the two-pronged test for terminating parental rights.
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)."
B.M. v. State, 895 So.2d at 331. Our supreme court has continued to adhere to the two-prong test, reversing a judgment terminating parental rights based on the failure to properly investigate and consider potential viable alternatives in cases like Ex parte T.V., 971 So.2d 1 (Ala.2007), and Ex parte J.R., 896 So.2d 416 (Ala.2004).
The mother insists that DHR failed to meet the second prong of that test, "the viable alternatives prong," because, the mother says, the maternal grandparents *64 could take custody of the children as a viable alternative to terminating her parental rights. The record reflects that the maternal grandparents had custody of the children from November 2002 until June 2003. According to the court report in evidence,[2] the children suffered from continued bouts of head lice during their stay with the maternal grandparents. In addition, the court report states that the day-care facility at which the children were enrolled reported that the children had problems with personal hygiene to the extent that workers actually bathed the children and shampooed their hair after they arrived at the day-care facility. Although the maternal stepgrandmother was not employed during the time the children were in her care, the children were enrolled in full-time day care and the maternal stepgrandmother was sometimes 15 to 30 minutes late in picking the children up from day care.
At the time of the termination hearings, the maternal grandfather was deployed overseas on active military duty. The maternal stepgrandmother injured her hip and had surgery shortly before the February 2007 hearing, and she had reinjured herself in a fall on the date of the March 2007 hearing. DHR had ruled out the maternal grandparents as potential relative resources as a result of their earlier experience as custodians of the children; the maternal grandfather's deployment overseas and the maternal stepgrandmother's hip surgery and continued health concerns are further reasons that awarding custody to the maternal grandparents was not a viable alternative to the termination of the mother's parental rights. The evidence supports the juvenile court's finding that awarding custody to the maternal grandparents was not a viable alternative to termination in the present case.
Because DHR proved, by clear and convincing evidence, grounds for termination of the mother's parental rights and that there existed no viable alternatives to termination, we affirm the judgment of the juvenile court.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs specially, with writing, which THOMAS, J., joins.
THOMAS, J., concurs specially.
MOORE, J., concurs in part and concurs in the result, with writing.
BRYAN, Judge, concurring specially.
Pursuant to Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala.1976), a state must establish that it has a compelling governmental *65 interest before terminating a parent's parental rights. Under a strict-scrutiny analysis, the state is required to achieve this objective in a means that is least restrictive or drastic. As the Conn court stated: "The State's interest, however, would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing." Id. (emphasis added).
After Conn, this court held that juvenile courts must inquire as to whether viable alternatives to terminating a parent's parental rights exist during the termination hearing. See Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370, 1373 (Ala.Civ.App.1979); Glover v. Alabama Dep't of Pensions & Sec., 401 So.2d 786, 789 (Ala.Civ.App.1981); and In re Shivers, 440 So.2d 1081 (Ala.Civ.App.1983). At the time Miller, Glover, and In re Shivers were decided, the Alabama Juvenile Justice Act ("AJJA"), codified at § 12-15-1, Ala.Code 1975 et seq., was the only statute that governed the termination of a parent's parental rights. See § 12-15-71(a), Ala. Code 1975; see also D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 89 n. 9 (Ala.Civ.App.2003) (plurality opinion).
In 1984, our legislature enacted the Child Protection Act ("CPA"), codified at § 26-18-1 et seq., Ala.Code 1975. The purpose of the CPA is as follows:
"[T]o provide meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights in such a manner as to protect the welfare of children by providing stability and continuity in their lives, and at the same time to protect the rights of their parents."
§ 26-18-2, Ala.Code 1975. Section 26-18-7, Ala.Code 1975, explicitly sets forth grounds for terminating a parent's parental rights. Citing the CPA, this court stated in In re Colbert, 474 So.2d 1143, 1145 (Ala.Civ.App.1985):
"In order to terminate parental rights, the court must apply what is essentially a two-prong test. First, the court must find from clear and convincing evidence that the child is dependent. § 12-15-65(e), Code of Alabama 1975. See § 26-18-7(a), Code of Alabama 1975; Brown v. Alabama Department of Pensions and Security, [473 So.2d 533 (Ala.Civ. App.1985)]. Once dependency is found, our court has stated that the trial court must determine whether less drastic measures than termination of parental rights would best serve the interest of the child. See Glover v. Alabama Department of Pensions and Security, 401 So.2d 786 (Ala.Civ.App.1981); Miller v. Alabama Department of Pensions and Security, 374 So.2d 1370 (Ala.Civ.App. 1979)."
This court, citing pre-CPA cases in In re Colbert, continued to require juvenile courts to make a determination regarding the dependency of a child and to find that no viable alternatives to termination existed, applying the "two-prong" test in termination-of-parental-rights cases after the CPA was enacted.[3] Our supreme court then articulated the "two-prong" test in Ex parte Brooks, 513 So.2d 614, 617 (Ala. 1987). In overruling Ex parte Brooks insofar as it required a parent who sought to terminate the other parent's parental rights to establish the dependency of a child, our supreme court in Ex parte Beasley, 564 So.2d 950 (Ala.1990), also articulated *66 this "two-prong" test. Despite this court's and our supreme court's opinions requiring the application of the viable-alternatives prong at the termination proceeding, I agree with Judge Moore insofar as he concludes that there is no basis provided in the CPA or the AJJA for applying the "two-prong" test at the termination proceeding, as suggested in Ex parte Beasley.
In 1997, Congress enacted the Adoption and Safe Families Act ("ASFA"), codified at 42 U.S.C. §§ 671 and 675. Our legislature amended the AJJA in 1998 to comply with federal legislation to receive federal funding. Our legislature amended § 12-15-62, Ala.Code 1975, requiring our juvenile courts to comply with the ASFA. Specifically, § 12-15-62(c) requires juvenile courts to hold a permanency hearing within 12 months of the entry of an order placing a child in foster care. Furthermore, that section states, in pertinent part:
"The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department [of human resources] has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian."
(Emphasis added.) As Judge Moore states in his special writing, § 12-15-62(c) requires juvenile courts to determine whether placement of a child with a relative is a viable alternative before the termination-of-parental-rights proceeding, i.e., at the permanency hearing. Requiring juvenile courts to inquire of possible relative placements at this stage complies with the constitutional mandates set forth in Conn. Additionally, I agree with Judge Moore's determination that a juvenile court may bifurcate a trial, holding a permanency hearing before the termination proceeding, to consider a relative who presents himself or herself as a possible placement on the eve of a termination proceeding. However, juvenile court's should consider such relatives only in exceptional circumstances. First, DHR should have already inquired as to possible relative resources and should have conducted an investigation of those relatives before the permanency hearing. Second, a relative who is sincerely concerned about a child's welfare and is willing to serve as a placement should have already presented himself or herself as a viable alternative. I suggest that juvenile courts consider relatives who present themselves at "the eleventh hour" as a placement option only under extenuating circumstances that would render their untimely presentation justifiable, e.g., when the relative has recently recovered from a debilitating illness that prevented him or her from being a placement option earlier.
Furthermore, "[t]he purpose of imposing a time restriction [in the ASFA] was to shorten the amount of time children would remain in foster care." A.J.H.T. v. K.O.H., 983 So.2d 394, 403 n. 3 (Ala.Civ. App.2007) (Bryan, J., concurring specially) (citing Katherine A. Hort, Is Twenty-Two Months Beyond the Best Interest of the Child? ASFA's Guidelines for the Termination of Parental Rights, 28 Fordham Urb. L.J. 1879 (2001)). However, Alabama courts have continued to use the "two-prong" test in termination-of-parental-rights proceedings after the legislature amended the AJJA to include the time provisions of the ASFA. See A.H. v. State Dep't of Human Res., 763 So.2d 968, 969 (Ala.Civ.App.2000); C.W. v. State Dep't of Human Res., 826 So.2d 171, 172 (Ala.Civ. App.2002); J.M.O. v. State Dep't of Human *67 Res., 872 So.2d 174, 180 (Ala.Civ.App. 2003); Q.F. v. Madison County Dep't of Human Res., 891 So.2d 330, 335 (Ala.Civ. App.2004); and J.S. v. St. Clair County Dep't of Human Res., 969 So.2d 918 (Ala. Civ.App.2007). I believe that inquiring as to viable alternatives to terminationparticularly, inquiring as to the suitability of a relativeat the termination hearing is not in the best interest of a child, is not in accordance with the purposes of the ASFA, and does not promote a child's permanency and stability.
This court has held that "DHRnot the prospective custodianhas the burden of initiating investigations, and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child." D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 591 (Ala.Civ.App.1999). However, in Wilson v. State Department of Human Resources, 527 So.2d 1322, 1324 (Ala.Civ. App.1988), this court held: "In order to establish that termination of parental rights is the least drastic alternative, DHR should present evidence to the court of recent attempts to locate viable alternatives." (Emphasis added.) See also Bowman v. State Dep't of Human Res., 534 So.2d 304 (Ala.Civ.App.1988); V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998); and C.B. v. State Dep't of Human Res., 782 So.2d 781, 786 (Ala.Civ.App.1998).[4] Even after the 1998 amendments to the AJJA requiring DHR to present, and the juvenile courts to consider, a permanency plan for a child with 12 months of the entry of a court order placing a child in foster care, this court has continued to require DHR to present evidence of recent attempts to locate a viable alternative to termination. See B.S. v. Cullman County Dep't of Human Res., 865 So.2d 1188, 1196 (Ala.Civ.App.2003) (acknowledging caselaw argued on appeal stating that DHR has a duty to present evidence of recent efforts to locate a viable alternative); and J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475, 478 (Ala.Civ.App.2003) (same).
In my opinion, our juvenile statutes and caselaw regarding viable alternatives should be reconciled in view of the enactment of the CPA and the amendments to the AJJA.
THOMAS, J., concurs.
THOMAS, Judge, concurring specially.
I agree that the juvenile court's judgment terminating the mother's parental rights should be affirmed. Grounds for termination existed, the mother was not entitled to more time in which to rehabilitate herself, and awarding custody to the maternal grandparents was not truly a viable alternative to terminating the mother's parental rights. In addition, I agree with Judge Moore that the present method by which we terminate parental rights is not in accordance with either the Child Protection Act, codified at Ala.Code 1975, § 26-18-1 et seq., or the Adoption and Safe Families Act of 1997, codified at, among other places, 42 U.S.C. § 675, or portions of our Juvenile Justice Act, codified at Ala.Code 1975, § 12-15-1 et seq. I write specially to point out that the procedure outlined in our statutes, as explained by Judge Moore in his special writing, will improve the process by which our juvenile courts terminate parental rights.
The shift in procedure advocated by Judge Moore and supported by the language in our statutes will do little more than change the order in which our juvenile courts conduct proceedings in dependency *68 and termination cases. Our juvenile courts routinely hold permanency hearings, as required by § 12-15-62(c). If the juvenile courts were to follow the procedure outlined in our statutes and explained by Judge Moore, those hearings will continue but will become vitally important, as they should be. The Department of Human Resources routinely investigates potential relative resources for children who are removed from the custody of their parents from the time of removal and certainly at the first Individualized Service Plan ("ISP") meeting, both because of the shortage of suitable foster homes and because relative placements are viewed as being less traumatic for the children. Requiring that a juvenile court consider and either accept or reject relative placement at the 12-month permanency hearing when deciding whether the case should proceed to a termination hearing would place the emphasis at the permanency hearing where it belongson determining what permanent alternative serves the best interest of the children; likewise, this procedure will place the emphasis of the termination-of-parental-rights hearing where it rightfully belongson the grounds for termination.
MOORE, Judge, concurring in part and concurring in the result.
I fully concur in the main opinion's reasoning and its conclusion that the record contains clear and convincing evidence that the mother is unable or unwilling to discharge her parental responsibilities to and for the children. I concur in the result as to that portion of the main opinion upholding the juvenile court's judgment insofar as it finds that awarding custody to the maternal grandparents was not a viable alternative to the termination of the mother's parental rights. However, I write specially to explain why I do not believe the current procedure used in juvenile courts to determine the viability of relative placement complies with the applicable statutes.

Is it Appropriate to Decide the Viability of Alternative Custodial Arrangements in the Adjudicatory Proceeding?
By statute, if it is in the best interests of the child, see Ala.Code 1975, § 12-15-71, a juvenile court may, as an alternative to termination of parental rights, Ex parte J.R., 896 So.2d 416 (Ala.2004), place custody of a dependent child with a "fit and willing" relative, see Ala.Code 1975, § 12-15-62(c), who, "after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child." Ala.Code 1975, § 12-15-71(a)(3)c.
In Ex parte Beasley, 564 So.2d 950 (Ala. 1990), the supreme court stated:
"The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (As earlier discussed, if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)
"Once the court has complied with this two-prong testthat is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights *69 is in the best interest of the childit can order the termination of parental rights."
564 So.2d at 954-55. This excerpt seems to require juvenile courts to consider the question whether a dependent child should be placed in the custody of a relative after finding that grounds for termination exist, but before entering a judgment terminating parental rights. Routinely, therefore, juvenile courts have been deciding both prongs of the Beasley test in the same proceeding and subject to the same standard of proofi.e., "clear and convincing evidence, competent, material, and relevant in nature"see Ala.Code 1975, §§ 12-15-65(f) & 26-18-7(a); see also Ex parte State Dep't of Human Res., 890 So.2d 114, 118 (Ala.2004) (holding that juvenile court may only consider admissible evidence at termination-of-parental-rights hearing).
Putting aside the fact that the statement in Beasley regarding the procedure to be followed in termination-of-parental-rights cases does not appear to be supported by any statutory language in existence at the time it was decided,[5] it is clear that, as the law stands today, Beasley is no longer accurate. When the legislature amended the Alabama Juvenile Justice Act ("the AJJA"), Ala.Code 1975, § 12-15-1 et seq., in 1998 to comply with the Adoption and Safe Families Act ("the ASFA"), 42 U.S.C. § 671 and § 675, it mandated that juvenile courts hold a permanency hearing to determine a child's disposition within 12 months of the date the child first entered foster care. See Ala.Code 1975, § 12-15-62(c). In a permanency hearing, the juvenile court is to "determine" which of several custodial arrangements[6]return to the parent, referral for termination of parental rights and adoption, or placement with a relative or other legal custodian[7]"shall be" the permanency plan. Id. The purpose of requiring the 12-month permanency hearing is to comply with the policy behind the ASFA to ensure "that children are provided a permanent home as early as possible."[8] Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes, 10 A.L.R.6th 173, 193 (2006).
Based on the plain language of § 12-15-62(c), a juvenile court must, in a permanency *70 hearing, determine the issues of whether a "fit and willing" relativei.e., someone who is "qualified to receive and care for the child," § 12-15-71(a)(3)c. exists and whether placement with that relative serves the best interests of the child. Otherwise, the juvenile court could not make a determination as to whether relative placement should be the permanency plan for the child as required under § 12-15-62(c). Hence, the AJJA now expressly states that the determination of the viability of relative placement should take place in a proceeding separate from the hearing to determine whether grounds for termination of parental rights exist.[9]
Section 12-15-62(c) specifically requires a juvenile court to hold at least one permanency hearing within 12 months of when the child enters foster care; however, nothing in the law prohibits a juvenile court from holding more than one permanency hearing.[10] Thus, if, after the original permanency hearing, an interested party asserts that a material change of circumstances has occurred and that the permanency plan in effect is no longer in the best interests of the child, a juvenile court may conduct another permanency hearing for the purposes of reviewing the permanency plan and, if appropriate, modifying it. For example, if an interested party asserts on the eve of the termination hearing that placement with a relative has become a viable alternative due to intervening circumstances occurring since the last permanency hearing, the juvenile court may order another permanency hearing to immediately precede the hearing on the termination of parental rights. Upon proper notice to the parties, the juvenile court may bifurcate the trial by deciding, first, in the dependency action, the viability of relative placement, i.e., whether the relative is "fit and willing" and "qualified to receive and care for the child" and whether such placement would serve the child's best interests, and then, if still necessary, deciding, second, in the termination action, whether grounds for termination exist. However, under no circumstances does § 12-15-62(c) authorize a juvenile court to determine the question of the viability of relative placement during the adjudicatory phase, which is dedicated solely to determining whether grounds for termination exist.

What Evidentiary Standards Apply in Permanency Hearings?
In deciding which of the several custodial alternatives should be adopted as the permanency plan, a juvenile court should not be limited to admissible evidence. Alabama Code 1975, § 12-15-65(h), states, in pertinent part:
"In disposition hearings all relevant and material evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though not competent in a hearing on the petition."
In Ex parte State Department of Human Resources, 890 So.2d 114 (Ala.2004), the *71 supreme court concluded that hearings to terminate parental rights are divided into two phasesa fact-finding, or adjudicatory, stage and a dispositional stage. 890 So.2d at 116 (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). At the adjudicatory stage, the juvenile court
"determines `from clear and convincing evidence, competent, material, and relevant in nature, that the parents are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct is unlikely to change in the foreseeable future.' § 26-18-7(a), Ala.Code 1975."
890 So.2d at 116. Accordingly, the juvenile court may only accept and consider admissible evidence relevant to the issues relating to the alleged grounds for termination. 890 So.2d at 117.
On the other hand, the questions of which of several dispositional options serves the best interests of the child and which of those options should be adopted as the permanency plan do not involve any determination as to the unfitness of the parent or the dependency of the child.[11] It is only at a dispositional hearing, see Annotation, supra (noting that the requirement of a 12-month "permanency hearing" in the ASFA replaces the requirement of an 18-month "dispositional hearing" in prior federal law), that, by statute, a juvenile court may consider all material and probative evidence, even if that evidence would be incompetent in the adjudicatory phase. See, e.g., In re Billy W., 387 Md. 405, 875 A.2d 734 (2005); and In re M.J.G., 168 N.C.App. 638, 608 S.E.2d 813 (2005).
The AJJA and the Child Protection Act ("the CPA"), Ala.Code 1975, § 26-18-1 et seq., both specifically state that DHR must prepare and submit to the juvenile court a "study" relating to the qualifications of the relative "to receive and care for the child." See Ala.Code 1975, §§ 12-15-71(a)(3)c. & 26-18-8.[12] Typically, home studies contain voluminous inadmissible information pertaining to the relative's family history, criminal background, income, mental and physical condition, past and present child-rearing abilities, drug and alcohol use, relationship with the child, and other similar topics. By mandating that juvenile courts receive and consider those reports, the legislature has clarified that a hearing to determine the viability of placing a child with a relative is a dispositional hearing under § 12-15-65(f).
Because DHR has the burden of initiating investigations and proving the unsuitability of prospective custodians, see Ex parte J.R., 896 So.2d at 428 (quoting D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 591 (Ala.Civ.App. 1999)), at a permanency hearing, DHR would bear the burden of proving that a prospective relative custodian is not fit or willing to receive and care for the child or that it would not be in the best interests of the child to place him or her with the relative. However, DHR would not have *72 to carry that burden by clear and convincing evidence.
In adjudicatory proceedings to determine dependency and whether grounds for termination of parental rights exist, the applicable statutes specifically require proof by clear and convincing evidence. See Ala.Code 1975, §§ 12-15-65(f) & 26-18-7. In Santosky v. Kramer, supra, the Supreme Court held that, as a matter of due process, states may only find a parent unfit for the purpose of terminating parental rights based on at least clear and convincing evidence. However, no Alabama statute requires clear and convincing evidence in a dispositional hearing aimed at determining whether placement with a relative, or some other placement option, is viable and in the best interests of the child. Likewise, the constitutional right to due process does not require clear and convincing evidence at a dispositional hearing in which the state is not deciding the fitness of the parents, but is actually considering whether it should forgo terminating parental rights in favor of another disposition that serves the best interests of the child. See, e.g., In re D.T., 212 Ill.2d 347, 818 N.E.2d 1214, 289 Ill.Dec. 11 (2004).
Current Alabama caselaw requires a juvenile court to assess the question of viable alternatives based on the clear-and-convincing-evidence standard. See, e.g., Ex parte T.V., 971 So.2d 1 (Ala.2007). The application of this standard arose directly from the fusing of the two prongs of the Beasley test into one proceeding. Properly separating the determination as to whether grounds for termination exist from the determination as to what disposition is in the best interests of the child clearly reveals the error of applying a clear-and-convincing-evidence standard to the viable-alternatives issue.
By following appropriate procedure, as outlined above, the juvenile courts will comply with both Beasley and the ASFA. The juvenile courts will still explore all viable alternatives before making a termination-of-parental-rights determination, as Beasley requires, but they will simply do so in a bifurcated manner that expedites the disposition of the dependent child in compliance with the ASFA.

Did the Juvenile Court Err in Excluding Awarding Custody to the Maternal Grandparents as a Viable Alternative?
Upon my first consideration of this case, I concluded that DHR had failed to adequately investigate the maternal grandparents and that DHR had failed to present sufficient evidence to prove the maternal grandparents' unsuitability to receive and care for the children.[13] The oral testimony presented at the hearing revealed nothing about the maternal grandparents to suggest their unsuitability to receive and care for the children. However, upon more thorough consideration, I am convinced that DHR presented sufficient evidence through court reports and other documents submitted to the juvenile court to prove that the maternal grandfather had abused the mother when she was a teenager and that the maternal grandparents had neglected the children while they were under *73 their care in 2002 and 2003. Although most of that evidence may not have been admissible within our rules of evidence, under the views I have expressed above, the juvenile court could have properly considered the content of those documents in deciding the viability of placing the children with the maternal grandparents. Alternatively, because the mother failed to object to the admission of those documents, the juvenile court could have considered those documents when concluding that clear and convincing evidence proved that placement with the maternal grandparents was not a viable alternative. See, e.g., Ex parte Williamson, 907 So.2d 407 (Ala.2004).
Although I concur in the main opinion's conclusion that the judgment of the juvenile court should be affirmed, I note that, had the juvenile court followed the statutory procedure set out above, the juvenile court would have decided the viability of placing J.B. with the maternal grandparents in late 2004 and would have decided that issue in regard to K.T. in August 2005. See Ala.Code 1975, § 12-15-62(c) (establishing circumstances that commence 12-month period to hold permanency hearing). Instead, the juvenile court did not adjudicate the viability of placing the children with the maternal grandparents until March 7, 2007. In my opinion, that delay violates the letter and the purpose of the law. With that said, the juvenile court cannot be placed in error for merely acting in accordance with our present caselaw.
NOTES
[1] The juvenile court also terminated the parental rights of the children's respective fathers. This court has already considered the appeal of B.B.T., K.T.'s father. See B.B.T. v. Houston County Dep't of Human Res., 985 So.2d 479, 480 (Ala.Civ.App.2007). J.B.'s father did not appeal the termination of his parental rights.
[2] The mother's attorney objected to the admission of the court report at the commencement of the termination trial. DHR's attorney stated that he was not offering the court report and directed the juvenile court's attention to the fact that the earlier court reports had been admitted into evidence at earlier proceedings. The juvenile court made no comment. The mother's attorney failed to object at this point and raised no objection that the earlier admission of the court reports in other proceedings would not permit the court to consider those documents as evidence in the termination trial. See Rule 105, Ala. R. Evid. (indicating that, in situations in which evidence is admissible for one purpose but not another, a court, "upon request, shall restrict the evidence to its proper scope...." (emphasis added)). Compare Ala.Code 1975, § 12-15-65(f) (requiring evidence in an adjudicatory phase of a dependency proceeding to be "competent, material, and relevant") with § 12-15-65(h) (permitting the juvenile court to consider "all relevant and material evidence," even if it is "not competent in a hearing on the petition" in disposition hearings); see also Y.M. v. Jefferson County Dep't of Human Res., 890 So.2d 103 (Ala.Civ.App. 2003), aff'd, Ex parte State Dep't of Human Res., 890 So.2d 114 (Ala.2004).
[3] Later cases have stated that the determination of grounds for termination pursuant to § 26-18-7 is the first prong of the "two-prong" test and that the issue of dependency is a threshold issue. See Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).
[4] The 1998 amendments to § 12-15-62 of the AJJA became effective on April 22, 1998, and were inapplicable at the time this court decided V.M. and C.B.
[5] By its plain language, Ala.Code 1975, § 26-18-7, limits an adjudicatory hearing to consideration of whether grounds for termination exist based on a review of evidence supporting the factors set out in that statute and other relevant evidence. Whether a dependent child may be placed with a relative is irrelevant to the determination of whether the parent is unwilling and unable to properly care for the child or whether the parent's conduct or condition that renders him or her unfit is likely to change in the foreseeable future. Hence, the statute does not refer to relative placement as an alternative to termination of parental rights as a factor to be considered at the adjudicatory hearing.
[6] The applicable statute allows the juvenile court to order DHR to make reasonable efforts to place the child for adoption or with a legal custodian while concurrently making reasonable efforts to reunite the child with the parent. See Ala.Code 1975, § 12-15-65(n).
[7] Alabama Code 1975, § 12-15-62(c), provides, in part:

"The permanency hearing shall determine whether the plan will include placement in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, be placed for adoption, or be placed with a fit and willing relative, or with a legal custodian."
[8] See Ala.Code 1975, § 12-15-65(m), which is virtually identical to 42 U.S.C.A. § 671(a)(15)(C), a part of the ASFA.
[9] Alabama Code 1975, § 26-18-8, which was enacted in 1984, authorizes the juvenile court to transfer custody of the child to a qualified relative following a judgment terminating parental rights, but it does not describe the procedure for determining the qualifications of the relative. Construing § 26-18-8 together with § 12-15-62(c), it appears that the legislature now requires that that determination be made in a permanency hearing.
[10] In fact, 42 U.S.C. § 675(5)(C), upon which Ala.Code 1975, § 12-15-62(c)., is based, specifically requires additional permanency hearings at least every 12 months after the first 12-month permanency hearing if the child continues in foster care.
[11] Alabama Code 1975, § 12-15-65(f), establishes that hearings to decide the dependency of a child also are adjudicatory proceedings. That section provides, in pertinent part:

"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the child is dependent..., the court may proceed immediately, in the absence of objection showing good cause or at a postponed hearing, to make proper disposition of the case."
[12] In Wallace v. Pollard, 532 So.2d 632 (Ala. Civ.App.1988), this court held that DHR is not required to perform a formal home study, but DHR often does prepare such studies.
[13] Also, at one point, the juvenile court appeared to indicate that it could not consider the maternal grandparents as a placement alternative because they had not filed a custody petition. That understanding is erroneous because DHR has the burden of investigating the suitability of relatives regardless of whether they have filed a custody petition. See Ex parte J.R., supra. However, any error the juvenile court may have committed in this regard did not affect the outcome because the evidence supported its final determination that awarding custody to the maternal grandparents was not a viable alternative. See Rule 45, Ala. R.App. P. (stating that a judgment will not be reversed based on harmless error).